## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

---

THE SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN, a federally
recognized Indian tribe,

                Plaintiff,

v.

MARK G. PEARCE, CHAIRMAN, KENT
Y. HIROZAWA, PHILIP A.
MISCIMARRA, HARRY I. JOHNSON, III,
and LAUREN MCFERRAN in their official
capacities as members of the National Labor
Relations Board, and TERRY A. MORGAN
in her official capacity as Regional Director
of Region 7.

                Defendants.

Court File No.
1:15-cv-12077

---

## Complaint

---

Plaintiff, the Saginaw Chippewa Indian Tribe of Michigan, by and through its counsel, alleges:

## Parties

1.     The Saginaw Chippewa Indian Tribe of Michigan ("Tribe") is a federally recognized Indian Tribe.[1]

2.     The National Labor Relations Board is a federal agency that administers the National Labor Relations Act,[2] and maintains offices nationwide, including an office in Detroit, Michigan.

3.     Defendant Mark G. Pearce is Chairman of the National Labor Relations Board and is sued in his official capacity.

4.     Defendant Kent Y. Hirozawa is a member of the National Labor Relations Board and is sued in his official capacity.

5.     Defendant Philip A. Miscimarra is a member of the National Labor Relations Board and is sued in his official capacity.

6.     Defendant Harry I. Johnson, III is a member of the National Labor Relations Board and is sued in his official capacity.

7.     Defendant Lauren McFerran is a member of the National Labor Relations Board and is sued in her official capacity.

8.     Defendant Terry A. Morgan is the Regional Director of Region V and is sued in her official capacity,

---

[1] *See* Indian Entities Recognized and Eligible To Receive Services from the United States Bureau of Indian Affairs, 78 Fed. Reg. 26,384 (May 6, 2013).
[2] National Labor Relations Act, 29 U.S.C. §§ 159–169 (2012) ("NLRA" or "Act").

9.     This Complaint refers to the National Labor Relations Board and its members, along with Defendant Terry A. Morgan (the "Regional Director") collectively as the "Board."

## Jurisdiction

10.     This court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 1362 because the action is brought by a federally recognized Indian tribe with a governing body duly recognized by the Secretary of Interior and raises substantial questions of federal law arising under the Tribe's treaties with the United States, the United States Constitution and federal statutory and common law.

11.     In particular, his Court has jurisdiction to issue injunctive relief against the Board because the Board has wholly deprived the Tribe of constitutional, treaty-protected, and statutory rights and has done so in the clear absence of statutory authority.

12.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b) because this District includes the Tribe's Isabella Reservation, the territory over which the Tribe exercises sovereign authority and operates, manages, and regulates federally approved gaming facilities.

## Background

### Sovereign Tribal Rights

13.    The lands occupied by the Tribe within the State of Michigan were first set apart by Executive Order in 1855 and then secured by Treaties in 1855 and 1864.[3] Under its Constitution,[4] the Tribe has sovereign authority over these lands set aside for its Isabella Indian Reservation.

14.    The provisions of the 1855 and 1864 Saginaw Treaties remain in full force today.[5]

15.    The Tribe's inherent sovereign authority over its members and territories, protected by the Treaties, includes the Tribe's rights to:

   a.    Manage the use of its Tribal territory and resources by both members and nonmembers;

   b.    Undertake and regulate economic activity within Tribal territory;

   c.    Make its own laws and be ruled by them;

---

[3] *See generally*, Executive Order of May 14, 1855, *in* 3 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 846–47 (1913) ("Executive Order"), Ex. A; Treaty with the Chippewa of Saginaw, Swan Creek, and Black River, August 2, 1855, 11 Stat. 683 (Aug. 2, 1855) ("1855 Treaty"), Ex. B; Treaty with the Chippewa of Saginaw and Swan Creek and Black River, 1864, 14 Stat. 637 (Oct. 18, 1864) ("1864 Treaty"), Ex. C (collectively, "Treaties").
[4] Amended Constitution and By-Laws of the Saginaw Chippewa Indian Tribe of Michigan, Ex. D.
[5] *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, CIV. 05-10296-BC, 2010 WL 5185114 (E.D. Mich. Dec. 17, 2010); Motion for Relief from Judgment Denied, *Granholm*, 2011 WL 1884196.

4

      d.      Self-govern its members and territory;

      e.      Exclude unwanted persons from the Reservation; and

      f.      Place lesser conditions on entry into the Reservation.

### Governance and the Governmental Importance of the Casino

16.    Under the Indian Gaming Regulatory Act,[6] Indian tribes are authorized to conduct tribal governmental gaming as a "means of promoting economic development, and strong tribal governments,"[7] and may only use gaming revenues for governmental and charitable purposes.[8]

17.    Moreover, under the Tribe's own laws, the Tribe expressly operates the Casino as a governmental endeavor.

18.    The Casino is operated by Soaring Eagle Gaming, a governmental subdivision of the Tribe.[9]

19.    Soaring Eagle Gaming was chartered to "provide a funding source for the exercise of tribal sovereignty and the operation of tribal governmental programs and services."[10]

20.    Soaring Eagle Gaming operates Soaring Eagle on land within the Reservation held in trust by the United States for the Tribe.

---

[6] 25 U.S.C. §§ 2701–2721.
[7] *Id.* § 2702(1).
[8] *Id.* § 2710 (b)(2)(B).
[9] Charter of Soaring Eagle Gaming, Ex. E, at § 4.2.
[10] *Id.* § 3.8.

21.     The Soaring Eagle Gaming Board of Directors consists of the members of Tribal Council.[11] As Board of Directors, the Tribal Council maintains detailed oversight of the Casino. The Council hires all Casino management, requires regular reports from the Casino's departmental managers and directors, and even approves all the Casino's contracts with outside vendors, just as it does for every other governmental subdivision of the Tribe.

22.     The Tribe distributes all Casino revenues in accordance with the Tribe's federally approved revenue-allocation plan.[12]

23.     In order to conduct Class II[13] and Class III[14] gaming under the Indian Gaming Regulatory Act ("IGRA"), an Indian tribe must enact an ordinance regulating that activity, and that ordinance must be approved by the Chairman of the National Indian Gaming Commission ("NIGC").[15]

24.     The Tribal Council passed the Tribal Gaming Code to regulate its gaming operations, including the Casino, and to establish a Gaming Commission responsible for oversight, regulation and enforcement of the Tribal Gaming Code at the Casino.[16]

---

[11] *Id.* at § 5.
[12] *See* 25 U.S.C. § 2710(b)(3).
[13] *Id.* §§ 2703(7) (defining class II gaming).
[14] *Id.* § 2703(8) (defining class III gaming).
[15] *Id.* § 2710(b)(1)(B), (d)(1)(A).
[16] Gaming Code of the Saginaw Chippewa Indian Tribe of Michigan, Ex. F.

25.     The NIGC approved the Gaming Code on January 18, 1994.

26.     Section 1.1 of the Tribe's Gaming Code provides in pertinent part:

> 1.1.1 Tribal regulation and control of gaming activity within the jurisdiction of the Saginaw Chippewa Indian Tribe is essential for the protection of public health and welfare, and the interests of the Tribe and the residents of and visitors to the tribal community.

> 1.1.7 The Tribe is vigorously pursuing its goal of self-sufficiency and self-determination through the development of tribal businesses and enterprises. Because the Isabella Reservation lacks income-generating natural resources and because the Tribe's tax base is almost non-existent, the Tribe must rely on tribal business development to raise the funds necessary to expand its social, health, and education programs, increase employment and improve its on-reservation economy. This effort has recently become increasingly important as a result of cutbacks in federal and state funding and the increased costs of self-government. It is therefore essential that the Tribe develop new and expanded sources of revenue to support its ever-increasing governmental needs and to provide much needed employment and training for tribal members.

27.     Section 1.2 of the Tribe's Gaming Code states as its purpose, in pertinent part:

> 1.2.1 Regulate, control, and license the operation of all gaming within the jurisdiction of the Tribe.

> 1.2.3 Ensure that the operation of tribally regulated gaming will continue as a means of generating tribal revenue.

7

> 1.2.5 Promote and strengthen tribal economic development and self-determination and enhance employment opportunities for its members.
>
> 1.2.7 Ensure that all gaming revenue is used for the benefit of the Tribe and the Reservation community.

28. As IGRA mandates, the Gaming Code requires the Tribe to implement a system of licensing for primary management officials and key employees.[17] This system requires background investigations of primary management officials and key employees of the gaming enterprise, as well as ongoing tribal oversight of these officials and employees.[18]

29. Federal law also requires tribes to enter into Tribal-State gaming compacts before they may engage in class III gaming.[19] Once a valid compact is in effect, it has the force of federal law.[20]

30. On August 20, 1993, the Tribe and State of Michigan entered into the required Compact, and the Secretary of Interior approved it on November 19, 1993.[21]

---

[17] 25 U.S.C. § 2710(b)(2)(F)(ii).

[18] *Id.* § 2710(b)(2)(F)(i).

[19] *Id.* § 2710(d)(1)(C); § 2710(d)(3)(A) (compacts "govern[ ] the conduct of class III gaming activities").

[20] *Id.* §§ 2710(d)(2)(C), (d)(3)(B).

[21] Compact Between the Saginaw Chippewa Indian Tribe of Michigan and the State of Michigan Providing for the Conduct of Tribal Class III Gaming by the Saginaw Chippewa Indian Tribe of Michigan, Aug. 20, 1993 (approved Nov. 19, 1993), Ex. I.

31.    That Compact established the Tribe as the body with regulatory authority over The Casino and specifically acknowledges the authority of the Tribe's gaming laws and IGRA over the Tribe's gaming enterprise. It remains in full force and effect today.

32.    The Tribe has further regulated the Casino by enacting a No-Solicitation policy that forbids posting any literature that "encourages, advocates, demands, or requests a contribution of money, time, effort, personal involvement, or membership in any fund (charitable or otherwise), collection group, athletic team, or social, fraternal, religious, civic, or labor organization of any kind or type, or the purchase of nay merchandise, raffle tickets, etc."

33.    Because the Isabella Indian Reservation lacks sufficient income-generating natural resources and because the Tribe's tax base is nearly non-existent, the Tribe *must* rely on Tribal gaming to raise the funds necessary to finance and expand its social, health, education and governmental services programs (which benefit Tribal members *and* non-members), increase employment within the Reservation, and improve the Tribe's on-Reservation economy (also to the benefit of Tribal members *and* non-members). This effort has become increasingly important as federal and state funding cuts have increased the Tribe's share of its governmental costs.

34.    Even as the Tribe's self-governance costs have increased, the Tribe continues to use gaming revenues to fund the governmental efforts of neighboring cities, townships, and counties, and to fund intergovernmental projects with these non-Tribal neighbors. Every spring and fall, the Tribe shares a percentage of Class III gaming revenue with local non-tribal governments, as it has for over 20 years. Those local governments use the Casino-revenue grants for their own governmental purposes.

**The Board's "New Approach" to Tribes**

35.    For decades, the Board acknowledged "that Federal Indian law and policy preclude Board jurisdiction" over on-reservation tribal enterprises.[22]

36.    It properly acknowledged its responsibility to assert jurisdiction over *non-tribal* employers and individual Indians in Indian Country,[23] but recognized that under established principles of federal Indian law, *tribal* governmental employers were "implicitly exempt as employers within the meaning of the Act."[24]

37.    Ten years ago, the Board decided to "adopt a new approach[.]"[25]

---

[22] *San Manuel Indian Bingo & Casino & Hotel Emps. & Rest. Emps. Int'l Union*, 341 NLRB 1055, 1059 (2004) (citing *Fort Apache Timber Co.*, 226 NLRB 503, 506 (1976)).
[23] *E.g.*, *Navajo Tribe v. NLRB*, 288 F.2d 162, 164 (D.C. Cir. 1961) (upholding the Board's application of the Act to a private employer despite the employer's on-reservation location).
[24] *Fort Apache*, 226 NLRB at 506.
[25] *San Manuel*, 341 NLRB at 1057.

10

38.     Since then, the Board has focused its analysis on whether a tribe operates in interstate commerce—with little regard for the sovereign character of a tribal employer.

### Earlier Board Actions Against the Tribe

39.     This case presents the sixth time since the Board adopted its "new approach" that the Board has improperly sought to apply the Act to the Tribe.

40.     **First**: In October of 2007, the International Brotherhood of Teamsters ("Teamsters") filed a petition to hold a representation election on behalf of the Casino's housekeeping department. The Tribe argued to the Board that federal Indian law barred it from asserting jurisdiction over the Casino. The Board summarily rejected the Tribe's appeal in December 2007 because in the view of the Board the Tribe's request for review raised "no substantial issues warranting review."[26] The Board's Regional Director for Region 7 affirmed the hearing officer's ruling and issued a Direction of Election.[27] The Tribe asked the Board to review the Regional Director's decision, but the Board refused. The Tribe preserved its jurisdictional defenses while it cooperated with the Board's election

---

[26] *In re. Soaring Eagle Casino & Resort and Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, ("*Saginaw v. Board I* Board Decision"), 359 NLRB No. 92, 2013 WL 1646049 (NLRB April 16, 2013), Ex. G, at *7.
[27] *Id.*

in December 2007. The Teamsters soundly lost the election by a two-to-one margin.

41.     **Second**: In November of 2007, the International Union, Security, Police and Fire Professionals of America also filed a petition to hold a representation election on behalf of the Casino's security department.[28] Again, the Tribe argued that the Act does not apply to Indian tribes and that the Board did not have jurisdiction over the Casino. The Regional Director nevertheless issued a Direction for Election in January 2008. The Regional Director canceled that Direction the following month at the union's request.[29] The union's leadership later explained that it had never intended to go through with the election.[30] Rather, it used the Board's process to get access to the Tribe's confidential employee information. "[B]y requesting the election, the union got what it wanted – the full mailing list – a valuable organizing tool[,]"[31] but did not have to go through with an election it would lose.

42.     **Third**: Following these representation petitions, the Tribe passed Ordinance 28—Tribal Government Labor Ordinance, which prohibited employees from forming or joining labor organizations for purposes of collective bargaining

---

[28] *Id.* at *8.
[29] *Id.*
[30] *Security Force May Still Have Union Vote*, The Morning Sun, Feb. 23, 2008, attached as Ex. K.
[31] *Id.* at 1.

12

or mutual aid. The Teamsters filed a December 2007 charge with the Board alleging that Ordinance 28 violated the Act. After an investigation, the Board determined that it would issue a Complaint against the Tribe unless the parties could reach a settlement. In September 2008, the Tribe agreed to repeal Ordinance 28 and the Board issued a conditional order that, among other things, dismissed the Teamster's charge.

43.    **Fourth**: In April 2011, former Casino employee Susan Lewis filed a Board charge alleging that the Tribe terminated her for violation of its no-solicitation policy. The Board issued an administrative complaint alleging that the Tribe's Tribal-Council-enacted no-solicitation policy violates the Act. The Tribe again disputed the Board's jurisdiction, and brought an action in this Court to enjoin the Board's attempt to exert jurisdiction over the Tribe.[32]

44.    This Court granted the Board's motion to dismiss for lack of jurisdiction.[33] It reasoned that Section 10 of the Act vests jurisdiction over unfair labor practice claims with the Board and circuit courts, foreclosing any district court review.[34] Thus, although it was careful "not to suggest that the Tribe may not

---

[32] *Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board et al.* ("*Saginaw v. Board I* Injunctive Proceedings"), 838 F. Supp. 2d 598 (E.D. Mich. 2011).
[33] *Id.* at 607.
[34] *Id.* at 602-03.

in fact be correct that it is not subject to the Act[,]"[35] this Court held that that issue "will ultimately be resolved by the Sixth Circuit[.]"[36]

45.    The Tribe spent the next *four years* navigating through the Board's process to reach the Sixth Circuit.

46.    The Board hearing took place on December 14 and 15, 2011. The presiding Administrative Law Judge Rosas acknowledged that he had no experience in federal Indian law or treaty interpretation. Throughout the hearing, Judge Rosas sustained relevance objections to Indian-understanding treaty-interpretation evidence.[37] When the Associate General Counsel representing the union lodged a relevance objection to testimony concerning Indian understanding of the Tribe's Treaties, Judge Rosas stated, "what I'm hearing thus far is very new to me based on I think most of our legal education regarding basic contract law between parties to the extent that agreements are generally construed from an objective standpoint."[38] Following a sidebar addressing the objection, Judge Rosas repeated, "let me also say while the witness is coming back in, again, this seems like a very unusual situation . . . *is all very—appears to be very new to me*."[39]

---

[35] *Id.* at 607.
[36] *Id.* at 600.
[37] *E.g.*, Excerpted Transcript of *In re. Soaring Eagle Casino & Resort and Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, Case No. 07-CA-053586 (Dec. 14, 2011), Ex. H at 29:6–18.
[38] *Id.* at 20:24–21:3.
[39] *Id.* at 23:9-14 (emphasis added).

47.     In the end, the Judge accepted the Tribe's unrebutted evidence of its enduring treaty rights, but nevertheless determined—contrary to the well-established reserved-rights doctrine[40]—that the Act, which is silent as to tribes, affords the Board jurisdiction over the Tribe because the Tribe's "general" rights cannot block the Board's exercise of jurisdiction.[41]

48.     The Board adopted the Judge's decision with little additional analysis in an April 16, 2013 Order,[42] and the Tribe appealed to the Sixth Circuit.

49.     The Board that issued the April 16, 2013 Order was comprised of recess appointments that the Board reasonably should have known were constitutionally suspect.[43] The Tribe requested that the Board stay its decision

---

[40] *E.g.*, *United States v. Winans*, 198 U.S. 371, 381 (1905) (explaining that an Indian treaty is "not a great of rights *to* the Indians, but a grant of rights *from* them—a reservation of those [rights] not granted." (emphasis added); *Winters v. United States*, 207 U.S. 564 (1908) (finding riparian rights in a treaty that didn't mention water); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144–47 (1982) (finding right to impose a severance tax on oil and gas in a treaty that didn't mention oil, gas, or taxation); *United States v. Bresette*, 761 F. Supp. 658, 662 (D. Minn. 1991) (finding right to sell molted feathers in a treaty right to hunt and fish); *U.S. v. Michigan*, 471 F. Supp. 192, 257, 273 (W.D. Mich. 1979) *aff'd by* 653 F.2d 277 (6th Cir. 1981) (Sault Ste. Marie Tribe's aboriginal rights to fish in off-reservation waters preserved *even though* the rights were not expressly listed in the Treaties because no language in the treaties expressly abrogated or diminished the rights); *accord Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1284 (10th Cir. 2010) (silent employment law of general application does not apply to tribes).
[41] *Saginaw v. Board I* Board Decision, Ex. G at *11–13.
[42] *Id.* at *1.
[43] *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013); *NLRB v. Enter. Leasing Co. Se.*, 722 F.3d 609 (4th Cir. 2013).

pending the outcome *NLRB* v. *Noel Canning*, a constitutional challenge to the
Board's appointments, but the Board refused.

50.    The Tribe raised the constitutional infirmity of the Board's order with
both the Board in 2013, and later with the Sixth Circuit, but the Board took no
steps (even after it was properly constituted by the President in August of 2013) to
ratify or otherwise shore up its order. Its failure to do so added at least ten months
to the timeline of the Sixth Circuit case.

51.    On the day of the parties' oral argument to the Sixth Circuit, the U.S.
Supreme Court confirmed in *NLRB* v. *Noel Canning*, 134 U.S. 2550, ___ U.S. ___
(2014) that the recess appointments were unconstitutional.[44] In response, the Sixth
Circuit decided not to hold the scheduled argument, vacated the order, and
remanded the matter to the Board.

52.    On October 27, 2014, the properly constituted Board again issued a
Decision and Order against the Tribe. Its analysis of the Indian law issue that controls
this case, in its entirety, was:

> In view of the decision of the Supreme Court in *NLRB v. Noel Canning*,
> supra, we have considered de novo the judge's decision and the record
> in light of the exceptions and briefs. We have also considered the now-
> vacated Decision and Order, and we agree with the rationale set forth
> therein. Accordingly, we adopt the judge's recommended Order to the

---

[44] *NLRB v. Noel Canning*, No. 12-1281, __ S.Ct. __, 2014 WL 2882090 (June 26, 2014).

extent and for the reasons stated in the Decision and Order reported at 359 NLRB no. 92 (2013), which is incorporated herein by reference.[45]

53.     The Tribe petitioned for review of that Order in Case No. 14-2405, and the Board sought cross-enforcement in Case No. 14-2558. The parties agreed to rely on their earlier briefing to speed review of the appeal the Tribe had spent years trying to bring to the circuit court.

54.     The Sixth Circuit heard oral argument on April 29, 2015.

55.     At argument, the Board's attorney stated, "it's one thing to say that there's this broad sovereign authority that tribes enjoy, but it's another to say that Congress must expressly abrogate a particular attribute of that sovereignty in order for federal laws apply."[46]

---

[45] 361 NLRB No. 73 (NLRB 2014).

[46] *Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board*, Case No. 13-1569 (6th Cir. April 29, 2015). Oral Argument available at: http://www.ca6.uscourts.gov/internet/court_audio/aud2.php?link=http://www.ca6.uscourts.gov/internet/court_audio/audio/04-29-2015 - Wednesday/14-2405 Soaring Eagle Casino v NLRB.mp3&name=14-2405 Soaring Eagle Casino v NLRB (last visited on May 17, 2015) ("Sixth Circuit Oral Argument"). *Contra*, *e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999) ("Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so.") (citing cases).

56.    The panel appeared skeptical of the Board's position, stating:[47]

a.    "The Supreme Court's never really recognized that distinction [between tribal commercial and governmental activities] . . . . Sovereignty is a broader concept than you're allowing."

b.    "[Supreme Court cases] don't say you can abrogate sovereignty as long as it's a certain kind of their sovereignty—they said—if you fall within this definition of what constitutes their traditional grounds of sovereignty then you have to have this clear and express statement before it can be evidence—isn't that what they said?"

c.    "You seem to be arguing policy about what Congress should be able to do as opposed to addressing the question of what Congress did. I mean you are making this assertion that Congress intended this to apply to Indians but where is the support and hasn't there been a standard established that says that it has to be clear? That we are not going to presume that Congress intended to do this, but we want to see that they intended to do it."

d.    "Doesn't this turn the law on its head by presuming it applies?"

e.    "That's exactly turning all the presumptions on their head."

f.    "So, if we adopt your position, we adopt your argument and agree with that, doesn't that really eviscerate the Tribe's right to the very benefits of the treaty that it was intended to provide because it would eviscerate their right to self-governance, doesn't it, if we take the position you are arguing?"

g.    "Why isn't that a policy argument that you should be making to Congress? You should say to Congress that you should expressly include Indian tribes, you should expressly abrogate

---

[47] Sixth Circuit Oral Argument available at: http://www.ca6.uscourts.gov/internet/court_audio/aud2.php?link=http://www.ca6.uscourts.gov/internet/court_audio/audio/04-29-2015 - Wednesday/14-2405 Soaring Eagle Casino v NLRB.mp3&name=14-2405 Soaring Eagle Casino v NLRB (last visited on May 17, 2015).

their sovereignty to the extent necessary to apply this statute. Why are we doing this? This is all policy arguments you are making and they are policy arguments that fly in the face of the policy arguments that for years have under laid all of this Indian law."

57.    The case has now been submitted for decision.

58.    **Fifth**: While the parties were presenting the question of the Board's jurisdiction to the Sixth Circuit, the Board sent the Tribe yet another Notice of Representation Hearing, again on behalf of the International Union, Security, Police and Fire Professionals of America seeking to represent the Casino's security department. The notice, sent May 20, 2014, demanded that that Tribe appear at a May 30, 2014 hearing and mount *another* jurisdictional defense a mere ten days from the date that the union filed its petition.[48] The ten-day period included Memorial Day, a federal holiday. It further demanded certain information— including confidential information—from the Tribe "*Immediately*[.]"[49]

59.    The Tribe pleaded with the Board to briefly delay the pre-election hearing in order to allow the Tribe time to prepare its treaty case. During these discussions, the Tribe learned that the Field Investigator (who is the same official who would compile the evidentiary record at the hearing) might preclude the Tribe

---

[48] May 20, 2014 Letter from T. Morgan to J. Sowmick with attachments, Ex. J.
[49] *Id.* at 2 (emphasis in original).

from offering certain expert testimony and from structuring its case in the manner it believed most persuasive.

60.     The Board questioned why the Tribe would need to offer additional evidence, suggesting that the Tribe should stand on the jurisdictional record that the Board had already rejected. After the Tribe raised its due process concerns with the Board, the Regional Director offered to consider allowing the Tribe to present its case, but only if the Tribe filed an "Offer of Proof" describing how the Tribe's intended testimony "adds to the available record in prior litigation." In essence, the Regional Director demanded the right to pre-judge the Tribe's evidence before deciding whether the Board should hear the evidence at all.

61.     But the Board does not just make the record for its own review. In those cases where the Act allows review of Board decisions, the circuit court can only review the record that the Board compiled. Thus, if the Board improperly excludes evidence at the pre-election hearing (as happened when the Administrative Law Judge in the fourth Board action against the Tribe sustained relevance objections to treaty-interpretation and Indian-understanding testimony), then the evidence cannot be offered to reviewing Article III courts.

62.     The Board eventually postponed the hearing until August 2014. At the hearing, the Tribe offered additional evidence :

        a.      Of its participation in the fur trade, "a sophisticated, competitive, and lucrative system of commerce" as a means "to

20

advance and sustain [its] own tribal community[,]"[50] demonstrating that commercial activity with non-Indians is a "traditional tribal or governmental functions[;]"[51]

b. Concerning its reserved right "to regulate and sustain itself as an independent community[,]"[52] undermining the Board's treaty-right analysis; and

c. That a strike would effectively cut governmental revenue to the Tribe and to surrounding local units of government,[53] demonstrating that application of the Act "implicate[s . . .] critical self-governance issues"[54] for the Tribe *and* its neighbors.

63. The Board's *San Manuel* test calls for a case-by-case analysis of its jurisdiction over Indian tribes.[55] But the Board rejected all the newly offered evidence outright because "the Board has consistently applied San Manuel to the [Tribe], and asserted jurisdiction."[56]

64. The Tribe asked the Board to review the Regional Director's decision, but the Board refused.

65. The Board held an election on October 27, 2014. The workers voted against the union by a decisive 113 votes to 26 vote, a more than 4:1 margin.

---

[50] *Soaring Eagle Casino & Resort v. International Union, Security, Police, & Fire Professionals of America*, 07-RC-129013, at 3 (NLRB), attached as Ex. L.
[51] *San Manuel*, 341 NLRB at 1063.
[52] *Soaring Eagle Casino & Resort*, Ex. L, 07-RC-129013, at 4.
[53] *Id.*
[54] *San Manuel*, 341 NLRB at 1061.
[55] *Id.* at 1063; 2014 Decision, 4.
[56] *Soaring Eagle Casino & Resort*, Ex. L, 07-RC-129013, at 5.

66.     Unlike Section 10 unfair-labor-practice charges, which may be appealed to the circuit court, Section 9 election decisions may only be reviewed indirectly after the employer draws an unfair-labor-practice charge. That is, *if* the election results in unionization, and *if* the employer refuses to bargain with the union or takes some other action contrary to the act, and *if* the union files an unfair-labor-practice charge, *then* the employer can raise election infirmities in response to the unfair-labor-practice charge, eventually appealing those issues to a circuit court.

67.     For the Tribe, though, this indirect review has made the Board's election decisions fundamentally unreviewable.

68.     This Court noted in earlier proceedings that in the first two instances of the Board's improper assertion of jurisdiction, "[t]he Tribe did not seek relief (injunctive or otherwise) in this Court or the court of appeals."[57] It did not because it could not.

69.     The Board has forced the Tribe through the election process three times. In two of the cases, the workers voted overwhelmingly not to unionize. In the other, the Board stopped the election at the Union's request, so no vote was held. In each case, no union formed, leaving the Tribe with no way to draw an unfair-labor-practice charge. In each case, the Tribe was left with no avenue for

---

[57] *Saginaw v. Board I* Injunctive Proceedings, 838 F. Supp. 2d at 601.

Article III review of the Board's improper exercise of jurisdiction and no means to seek redress of the injuries of having to expend resources in the election proceedings and appear before a tribunal that lacks jurisdiction over the Tribe.

### The Board's "Vote Now, Understand Later" Rule Change

70.    On April 14 of this year, the Board changed the rules again. After 80 years of conducting workplace elections, it issued a new "ambush election" rule (the "2015 Rule") that implemented sweeping changes to the election process.

71.    The 2015 rule, *inter alia*:

a.    Requires employers to post and distribute to employees a Board notice about the petition and potential for an election within two days of receiving a petition from the Board (certain distribution was optional under the earlier rule);

b.    Requires employers to turn over highly personal information of employees (including home addresses, personal email address, and home and cell-phone numbers) to labor organizations for their use in election campaign efforts (the earlier rule required more limited information);

c.    Truncates the time between a petition for election and the hearing to determine whether an election should be had by requiring the Regional Director to set the hearing only eight calendar days after the date of service of the petition except in those cases the Regional Director determines are "unusually complex";

d.    Limits pre-election hearings to those questions that the Regional Director believes should be litigated (the earlier rule did not address what subjects could be litigated);

e.    Postpones evidence taking and litigation over critical voter-eligibility issues until *after* an election takes place;

f.   Allows the hearing officer to solicit offers of proof concerning those issues the regional director allows the parties to litigate and to refuse to accept evidence where the regional director determines that the offer of proof is insufficient (the earlier rule had no such restriction);

g.   Forbids employers from contesting the appropriateness of the proposed bargaining unit if it does not timely furnish an employee list (the earlier rule had no such restriction);

h.   Speeds up hearing times by requiring the hearing officer to continue the hearing from day to day absent "extraordinary circumstances" (the earlier rule left scheduling to the regional director's discretion); and

i.   Requires parties to receive permission from the Regional Director before filing a post-hearing brief, which may only address those subjects permitted by the Regional Director (the earlier rule allowed parties to file briefing at their option).

72.   As one dissenting Board member noted, the 2015 Rule "improperly shortens the time needed for employees to understand relevant issues, compelling them to 'vote now, understand later.'"[58] By truncating the time between petition and election, the 2015 Rule "limits the right of all parties to engage in protected speech at precisely the time when their free speech rights are most important."[59]

73.   Moreover, by shearing the hearing process, the 2015 Rule is "fundamentally unfair and will predictably deny parties due process by

---

[58] 79 Fed. Reg. 74,430 (Dec. 15, 2014).
[59] *Id.* at 74,308, 74,439.

unreasonably altering long established Board norms for adequate notice and opportunity to introduce relevant evidence and address election-related issues."[60]

74.    In response to concerns about surrendering private cell-phone and email-address information, the Board noted that "the privacy, identity theft, and other risks may be greater than the Board has estimated," but nevertheless these "risks are worth taking."[61]

75.    The Board's cavalier treatment of *other people*'s personal information is particularly troubling in light of the on-the-ground history at Saginaw, where at least one union official admitted to using the Board's election process for the express purpose of collecting this confidential information, *not* participating in an election.[62]

76.    And as a dissenting Board member detailed, the 2015 Rule will increase the litigation burden on federal courts. "An employer will now be forced to litigate in an unfair labor practice case, before the Board and in Federal court, issues that are currently reviewed by the Board in a post-election appeal as a matter of right. Given the process an employer must go through to have a Federal court of

---

[60] *Id.* at 74,431.
[61] *Id.* at 74,342.
[62] *Security Force May Still Have Union Vote*, The Morning Sun, Feb. 23, 2008, attached as Ex. K.

appeals review any disputed issue regarding an election, there is often substantial delay in the final resolution of the representation case."[63]

77.    Yet, the 2015 Rule does not address why such strict curtailment of hearings and election timelines was necessary or why the Board required such a deep intrusion into the privacy of workers who may never have met the labor union officials and certainly never consented to giving their personal emails and cell numbers.

78.    Under the earlier rules, unions already won more than two-thirds of all representation elections, so the rule cannot be addressed to any legitimate concern about employer coercion or overreaching.

79.    Over 90 percent of elections do not generate any pre-election litigation—a figure that surpasses the Board's stated 85 percent goal, so the rule cannot be addressed to any rational concern about burgeoning litigation costs.

80.    The Board's caseload has declined in recent years; 1959 saw 9,347 representation petitions filed, but only 1,986 were filed in 2013.[64] In 1959, the Board itself decided 1,880 of those cases; in 2014, it decided 48. Indeed, even before the 2015 Rule change, parties negotiated and entered into election agreements that avoided pre-election litigation in more than 90 percent of the

---

[63] 79 Fed. Reg. 74,451.
[64] *Id.* at 74,450.

representation cases. Thus, the rule cannot be addressed to institutional-resource concerns.

81.    And for several years, the Board has met and exceeded its own internal goals for election timing. In 1960, the median time between petition and the direction of election was 82 days, and more time passed before the election was actually held.[65] But by 1975, only 20 percent of all elections took more than 60 days after the petition was filed.[66] And for the past two years, the Board beat its own timing goals: it hoped to hold 90 percent of elections within 56 days of their petitions; in 2013 94.3% did so, and in 2014 95.7% did. The Rule cannot be explained by a concern that elections took too long when the Board was already meeting and exceeding its own standards.

82.    Instead, as the dissenting Board member noted, the 2015 Rule "leaves unanswered the most fundamental question regarding any agency rulemaking, which is whether and why rulemaking is necessary."[67]

83.    But the Board's procedure for adopting the 2015 Rule was also troubling. It first noticed the proposed rule in June of 2011.[68]

---

[65] 76  Fed. Reg. 36,814, n.16 (June 22, 2011).
[66] *Id.* at 36,814,  n.19.
[67] 79 Fed. Reg. at 74,431.
[68] 76 Fed. Reg. at 36,812 (Notice of Proposed Rulemaking)

84.     Less than a month after it published the proposed rule, the Board took testimony from almost 70 witnesses over a two-day period, giving each witness about five minutes to speak. Many testified against the rule.

85.     The Board received more than 65,000 comments on the proposed rule, and again, many opposed the proposed change.

86.     Several months after the comment period closed, the Board announced that it would hold a public meeting during which it would vote on a resolution concerning a modified version of the rule. The resolution, which included the changes to the proposed rule, was not released until the day before the meeting.

87.     By December 2011, Board Chairman Mark Pearce and then-Member Craig Becker voted to approve the rule. Then-Member Hayes did not participate in the vote but later issues his dissent.

88.     In May 2012, though, the U.S. District Court for the District of Columbia invalidated the rule because the two-person vote lacked a statutory quorum.[69]

89.     On February 6, 2014, The Board issued a second Notice of Proposed Rulemaking that  contained the same proposed changes as the invalidated rule.[70] It

---

[69] *Chamber of  Commerce of the U.S. v. NLRB*, 879 F. Supp. 2d 18, 28-30 (D.D.C. 2012).
[70] 79 Fed. Reg. 7,318 (Feb. 6, 2014).

noted that the 2014 proposal was "in essence, a reissuance of the proposed rule of June 22, 2011."[71]

90.    Only one of the Board's members—Chairman Pearce—served on the Board when the earlier comments were taken or otherwise participated in the earlier rulemaking process.

91.    But when the Board noticed a 60-day comment period, it told commentators that they need not "resubmit any comment or repeat any argument that has already been made."[72]

92.    The Board adopted the proposal and the 2015 Rule was published in the Federal Register on December 15, 2014.[73]

93.    Although the 2015 Rule included some modifications from the proposed rule, as the dissenting Board Members explained, "the Rule's primary purpose and effect remain the same: Initial representation elections must occur as soon as possible."[74]

94.    After two rounds of notice and comment, the dissenting Board Members noted that:

---

[71] *Id.*
[72] *Id.* at 7,319.
[73] 79 Fed. Reg. at 74,308.
[74] *Id.* at 74,430.

a.   "We still do not understand the reason for embarking on the path our colleagues have taken."[75]

b.   "[T]he Final Rule manifest[s] a relentless zeal for slashing time from every stage of the current pre-election procedure in fulfillment of the requirement that an election  be scheduled 'at the earliest date practicable,' but the Final Rule's keystone device to achieve this objective is to have elections occur *before* addressing important election-related issues."[76]

c.   "[T]he inescapable impression created by the Final Rule's overriding emphasis on speed is to require employees to vote as quickly as possible—at the time determined exclusively by the petitioning union—at the expense of employees and employers who predictably will have insufficient time to understand and address relevant issues."[77]

95.   The 2015 Rule also directly conflicts with Tribal law and policy. For

example, *inter alia*, The 2015 Rule:

a.   Purports to compel the Tribe to violate its own legislated No-Solicitation policy by requiring the Tribe to post and maintain a Board notice that the Tribe forbids its employees from posting; and

b.   Purports to compel the Tribe to violate its own confidentiality judgments by requiring the Tribe to give highly personal information of employees (including home addresses, personal email address, and home and cell-phone numbers) to labor organizations for their use in election campaign efforts.

c.   Affords insufficient time for the Tribal Council to meet or to confer with its legal counsel before encountering deadlines to make postings, to release employee information, and to raise objections to the process.

---

[75] *Id.* at  74,434.

[76] *Id.* at 74,432.

[77] *Id.* at 74,460.

**The Current Board Action**

96.     On May 12, 2015, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial Service Workers Union ("USW Union") filed a petition seeking a representation election of certain guest-services workers at the Casino.

97.     "To ensure the earliest possible notice of the filing of a petition and the Statement of Position requirement," the Board required the petitioner to serve "a copy of its petition" on the Tribe.[78]

98.     The USW Union served two different but substantially similar petitions on the Tribe.[79] Both petitions expressly excluded lead employees from the proposed bargaining unit.

---

[78] General Counsel's Guidance Memorandum on Representation Case Procedure Changes Effective April 14, 2015, at 3 (April 6, 2015), Ex. M; *see also* 29 C.F.R. § 102.60(a).

[79] May 11, 2015 RC Petition (with certificate of service on C. Jeffrey) ("First Petition"), Ex. O; May 11, 2015 RC Petition (with certificate of service on S. Reed) ("Second Petition"), Ex. P. Although the First Petition includes a certificate of service attesting to service on Ms. Jeffrey, Ms. Jeffrey was out of the office that day. The union representative actually served the First and Second Petitions on the Tribe's attorney, Mr. Reed. The Tribe disputes the accuracy of the certificate of service attached to the First Petition, but does not dispute that service was effective.

99.    The USW Union filed a third materially different petition with the Board.[80] The filed petition is silent as to whether the USW Union seeks to include lead employees in the proposed bargaining unit.

100.    The USW Union did not serve the Tribe with a copy of this third petition and has not to the Tribe's knowledge executed a certificate of service concerning this third petition.

101.    The Board proceeded on the third (unserved) petition, issuing a Notice of Hearing that included the third petition.[81]

102.    The substantive difference[82] between the petitions that the USW Union served on the Tribe and one it actually filed with the Board caused the Tribe significant confusion and delayed the Tribe's ability to respond to the petition.

103.    The petition falls under the 2015 Rule and set the Tribe on the "ambush election" track.

104.    The same day that the USW Union filed the petition, the Regional Director notified the Tribe that it would hear any objections to the Board's conduct

---

[80] May 12, 2015 RC Petition (addressed to S. Reed) ("Third Petition"), Ex. Q.
[81] *Id.*
[82] *Compare* Ex. O (First Petition) at 1 ¶ 6(b) (excluding "Leads" from the proposed bargaining unit) and Ex. P (Second Petition) at 1 ¶ 6(b) (excluding "Leads" from the proposed bargaining unit) *with* Ex. Q (Third Petition) at 6 ¶ 6(b) (remaining silent as to whether "Leads" are part of the proposed bargaining unit)

of an election—including the complex questions of Indian law that control this case but about which the Board has no expertise—on May 20, 2015.

105.  The notice gave the Tribe a mere eight days (six business days) to mount a full jurisdictional defense of its sovereignty to an administrative agency without any competence in the area.

106.  As this Court recognized, "[w]hether the Tribe is correct that the Board lacks jurisdiction" is an issue "that will ultimately be resolved by the Sixth Circuit[.]"[83]

107.  Because the Sixth Circuit already has under advisement the very case that will decide that issue, the Tribe asked the Regional Director to exercise her authority in this extraordinary case to stay the hearing until after the Sixth Circuit decides the case before it. Staying the case would maintain the status quo, avoiding further irreparable injury to the tribe's sovereignty, and would preserve all parties' resources.[84] The Regional Director refused because she did not believe a Sixth Circuit decision "is imminent."

108.  The Tribe further outlined its due-process concerns with the Board's hurry-up time frame in light of the fact that the Tribe must present a full treaty-grounded jurisdictional defense geared to the Board's "case-by-case" test each

---

[83] *Saginaw v. Board I* Injunctive Proceedings, 838 F. Supp. 2d at 600.
[84] Letter from S. Reed to E. Ray, May 17, 2015, Ex. N.

time the Board asserts jurisdiction over it. In particular, the Tribe advised the Regional Director that it could not prepare this evidence and make available its witnesses on a scant eight calendar days' notice.[85]

109.   Initially, the Board took the position that the Tribe should not need any time to prepare for the hearing because it can simply incorporate the record of previous cases. The Board did not answer, though, why the Tribe should do so when the Board purports to undertake a case-by-case analysis, or why any reasonable party would do so when the Board has already ruled against it on those records.

110.   Approximately 21 hours before the scheduled hearing, the Regional Director agreed to reset the hearing to June 15, 2015.

111.   Under the new rule, the Regional Director will decide what jurisdictional defenses, if any, the Tribe may litigate, and what evidence, if any, the Tribe may offer in its defense. At the close of the hearing, the Tribe may only offer a post-hearing brief concerning the complex treaty-interpretation questions that the Board has several times admitted are outside its expertise at the Regional Director's sufferance.

112.   Each time the Board directs an election, the Tribe must spend governmental funds—funds redirected from important governmental services—to

_____

[85] *Id.*

34

defend against the Board's illegal incursion into tribal sovereignty and protect the Casino—the Tribe's primary source of governmental funding—from unionization and potential strikes. This monetary injury is irreparable because the Board's sovereign immunity blocks the Tribe from seeking recovery against the Board.

113.   Each time the Board directs an election the Tribe must disrupt its normal business and governmental routines and schedules and employ additional consultant and legal services to address the election issues.

114.   Each time the Board directs an election, it improperly exercises jurisdiction over the Tribe in contravention of controlling federal Indian law, causing irreparable injury to the Tribe's sovereignty and treaty rights.

115.   But each of the past three times the Board proceeded with representation cases against the Tribe, the statutory structure of the Act foreclosed judicial review of the Board's decisions.

116.   If the Board's efforts to hold the election continue, it will irreparably damage the Tribe by, *inter alia*:

> a.   Requiring the Tribe to expend unrecoverable governmental resources and participate (again) in proceedings before a body that lacks jurisdiction, even while the circuit court decides the question;
>
> b.   Requiring the Tribe to allow a unionization election in direct contravention of the Tribe's inherent right to manage the use of its Tribal territory and resources by both members and nonmembers;

c.  Requiring the Tribe to allow a unionization election in direct contravention of the Tribe's inherent right to undertake and regulate economic activity within its territory;

d.  Requiring the Tribe to engage in certain speech that is contrary to its law and policy by requiring it to post and maintain a Board notice and requiring it to share confidential information with the USW Union;

e.  Requiring the Tribe to allow unwanted persons (including federal and union officials) onto the Reservation in direct contravention of the Tribe's inherent and treaty-protected right to exclude;

f.  Requiring the Tribe to follow Board procedures that curtail the Tribe's ability to make its case to the Board;

g.  If a union is certified, requiring the Tribe to bargain with an outside entity for application of its own laws to its on-reservation tribal enterprise, in direct contravention of its right to make its own laws and be ruled by them and to govern its territory; and

h.  Forcing the Tribe to spend significant sums of governmental funds—that it can never recoup from the sovereign-immune Board—to protect its sovereignty.

## Causes of Action

### Count I – Violation of the Tribe's treaty-protected inherent sovereign rights and the Constitutions' separation of powers

117.  The Tribe realleges and incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

118.  The Tribe conducts all of its tribal governmental gaming regulation, operations, and management activities, including its operations of the Soaring Eagle as an exercise of the Tribe's sovereign authority through the Tribal Council,

36

and in the exercise of the Tribe's treaty right of self-government, inherent

sovereign authority, and rights and obligations under IGRA, the Compact, and the

Tribe's laws.

119.   The Tribe's Treaties are the "supreme law of the land."[86]

120.   The U.S. Constitution textually commits power over Indian affairs to

Congress, not the executive.[87]

121.   The Board's application of the NLRA to the Tribe abrogates the

Tribe's treaty-protected sovereign right to exclude unwanted outsiders from its

territory by, *inter alia*:

> a.   Compelling the Tribe to allow Board officials and the USW Union to enter, access, or engage in activities at the Tribe's facilities on Isabella Reservation as part of the representation election; and

> b.   If the employees vote to unionize, requiring the Tribe to bargain exclusively with representatives selected by its employees, *id.* at § 159(a), divesting the Tribe of its power to determine who may enter its territory and with whom it will engage in economic activity, and deprive the Tribe of the right to administer and enforce its background check and licensing processes (*e.g.*, the Saginaw Gaming Ordinance Title IX), which are required by IGRA, 25 U.S.C. § 2710(b)(2)(F), and the Compact. At the same time, the Tribe would remain responsible for regulating gaming by shielding it from "organized crime and other corrupting influences."[88]

---

[86] U.S. Const. art. VI, cl. 2 (Supremacy Clause).
[87] U.S. Const. art. I, §8, cl. 3 (Commerce Clause); U.S. Const. art. II, §2, cl. 2 (Treaty Clause).
[88] 25 U.S.C. § 2702(2) (2012).

122. The Board's application of the NLRA to the Tribe abrogates the

Tribe's treaty-protected sovereign right to govern its territory by, *inter alia*:

a. Making the Tribe's treaty rights of self-government and power to exclude, its inherent sovereign authority, its gaming Compact, Charter, gaming ordinance and personnel ordinances, all of which it relies on to operate, manage and regulate activities at the Soaring Eagle location, subject to the requirements of the collective bargaining process, including the obligation to engage in collective bargaining[89] concerning "wages, hours, and other terms and conditions of employment, . . .";[90]

b. Subjecting the Tribe to the Board's power to determine the "unit appropriate for the purpose of collective bargaining[,]"[91] regardless of how the Tribe chooses to structure its labor force;

c. Guaranteeing tribal government employees the right to strike,[92] which jeopardizes the Tribe's ability to operate its government, protect the safety, health, and welfare of its members, residents, and visitors, and provide Tribal services, all of which the Tribe does in the exercise of its treaty rights of self-government and inherent sovereign authority, and in accordance with its own laws; and

d. Subjecting the Tribe's legislated personnel rules and its gaming laws to the jurisdiction of the Board,[93] depriving the Tribe of its treaty-protected sovereign right to administer and enforce its laws, and its right to adjudicate disputes arising under those laws.

---

[89] 29 U.S.C. §§ 157–159.

[90] *Id.* § 158(d).

[91] *Id.* § 159(b).

[92] *Id.* §§ 157, 158(a)(1).

[93] *Id.* §§ 158, 160.

123. The Board's application of the NLRA to the Tribe violates constitutional separation-of-power principles.

124. Under controlling principles of federal Indian law, the Board may only apply the Act in abrogation of the Tribe's inherent treaty-protected rights if there "is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."[94]

125. Neither Indian tribes nor tribal sovereignty is ever mentioned in the Act or its legislative history. Thus, there is no evidence that Congress considered and chose to abrogate tribal rights.

126. Because Congress did not make a considered determination that the Act should abrogate tribal sovereign rights, the Board may not apply the Act to the Tribe.

127. The Board's *ultra vires* exercise of jurisdiction over the Tribe causes the Tribe immediate and irreparable harm by preventing the Tribe from freely exercising its inherent and treaty-protected powers to govern itself, to regulate economic activity within its own territory, and to exclude unwanted outsiders from its territory, and violates Section 706(2)(B) of the Administrative Procedures Act.[95]

---

[94] *United States v. Dion*, 476 U.S.734, 739–40 (1986).
[95] 5  U.S.C. § 706(2)(B).

128.   The Tribe will be irreparably harmed if the election hearing proceeds.

129.   The Tribe has no adequate remedy at law.

## Count II – Violation of the Indian Gaming Regulatory Act

130.   The Tribe realleges and incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

131.   IGRA, the Compact, and the Tribe's laws implementing IGRA and the Compact comprehensively and exclusively regulate operation of the Casino.

132.   None of those laws makes the Act applicable to the Tribe's exercise of its sovereign authority through the operation, management, and regulation of activities at the Casino.

133.   None of those laws allows employees to organize or otherwise undertake collective action or demand collective bargaining.

134.   Applying the Act to the Tribe would require the Tribe to recognize an outside entity as an employee representative, and to bargain with that representative concerning all aspects of the operation, management, and regulation of the Casino, whether or not that entity met the Tribe's IGRA-required regulatory and licensing requirements.

135.   Moreover, IGRA affords tribes the "*exclusive* right" to regulate gaming on tribal lands,[96] but applying the Act to the Tribe would allow outside

---

[96] 25 U.S.C. § 2701(5) (emphasis added).

entities to bargain for the application of its alcohol testing, tribal-employment-preference, the IGRA-required Gaming Code and other laws to Casino employees, *even though* in IGRA Congress specifically left this Tribal regulatory authority intact.

136.   The Board's application of the Act to the Tribe's regulation, operation, and management of the Casino violates IGRA's protection of the Tribe's exclusive right to regulate its operation of the Casino and by purporting to override certain tribal regulation of the Casino and purporting to add certain Board regulation of the Casino.

137.   The Board's application of the Act to the Tribe's regulation, operation, and management of the Casino violates the Compact's protection of the Tribe's sovereign rights.

138.   The Tribe faces immediate and irreparable harm from the Board's application of the Act to the Tribe in contravention of IGRA, the Tribe's Compact and the Tribe's IGRA-required law because its refusal to accommodate IGRA forces the Tribe to either comply with the NLRA and violate IGRA or comply with IGRA and violate the NLRA.

139.   The Tribe will be irreparably harmed if the election hearing proceeds.

140.   The Tribe has no adequate remedy at law.

## Count III – Violation of Due Process (Biased Tribunal)

141.   The Tribe realleges and incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

142.   The Tribe has sovereign, liberty, and property interests in its Reservation, its Casino, and its exercise of its inherent and treaty-protected sovereign rights.

143.   To protect these liberty interests, the Tribe must exhaust its administrative remedies before raising the question with a federal court. In this case, though, the tribe's administrative remedies are illusory and occur before a biased tribunal.

144.   The Board has already proved itself to be a biased tribunal where the Tribe is involved.

145.   In the fifth Board proceeding against the Tribe, the Tribe relied on the Board's "case-by-case" test to present evidence that it fell within the Board's expressed exceptions to asserting jurisdiction.

146.   The Regional Director ruled against the Tribe, rejecting its newly proffered evidence because *earlier cases* (which did not have the benefit of the additional evidence) ruled against the Tribe.

147.   That is, the Regional Director, purporting to apply a case-by-case test, ruled against the Tribe solely because it had already ruled against the Tribe.

148.   The Board, in its discretion, refused to review the Regional Director's decision. Because the union lost the election, the Tribe could not draw an unfair-labor-practice charge. Thus, the Tribe had no avenue for Article III review of the Board's fifth proceeding against the Tribe.

149.   Moreover, the Board has asserted jurisdiction over the Tribe twice—in two different election proceedings—since the Tribe raised the question of the Board's jurisdiction over the Tribe with the Sixth Circuit.

150.   Even the Board's strict 2015 Rules allow the Regional Director to exercise her discretion to postpone the pending pre-election hearing "upon request of a party showing extraordinary circumstances."[97] It is difficult to imagine a circumstance more extraordinary than this:

> a. To assert jurisdiction over the sovereign Tribe, the Board relies on its "new approach" adopting a circuit-court test built on a single sentence of Supreme Court dicta that directly conflicts with established U.S. Supreme Court precedent;
>
> b.  Its assertion of jurisdiction directly violates the Tribe's inherent sovereignty, its treaty-protected sovereign rights, and a separate federal statute (IGRA);
>
> c. Each time the Board asserts jurisdiction over the Tribe, it causes the Tribe the irreparable injury to the Tribe's sovereign rights an further irreparably injures the Tribe by forcing it to expend unrecoverable governmental resources to fight the Board's improper assertion of jurisdiction;
>
> d. In at least one instance of the Board's improper assertion of jurisdiction, union officials admitted to invoking Board jurisdiction

---

[97] 29 CFR § 102.63(a)(1).

for the improper purpose of gaining employee contact information without any intent to seek a Board election;

e.  Because of the peculiarities of administrative exhaustion under the NLRA, the Tribe had no opportunity to seek Article III review of that assertion of jurisdiction or any other instance of the Board's improper exercise of jurisdiction until the *third* time the Board asserted jurisdiction over the Tribe;

f.  The Board asserted jurisdiction against (and so caused irreparable injury to) the Tribe *two more times* while that appeal was pending, finally placing the jurisdictional question that "will ultimately be resolved by the Sixth Circuit"[98] before that court; and

g.  To date, the Board has caused *unreviewable* irreparable injury to the Tribe four of the first five times it improperly asserted jurisdiction over the Tribe.

The Board has the authority to stop this runaway train. It refuses to use it.

151.   Although the Regional Director justifies her decision by supposing that a Sixth Circuit decision is "not imminent," it was the Board's refusal to fix its *Noel Canning* gaffe before the Supreme Court's decision, and its delay at the agency level after the Sixth Circuit vacated its unlawful order that added 10 months to the Sixth Circuit's decision timeline. The Tribe cannot guess how long the Sixth Circuit panel will take any more than the Board can, but it is reasonable to assume that it would have done so within the past 10 months had it not been for the Board's *Noel Canning* delay. The Board's reliance on a delay that it was responsible for creating further demonstrates the truly extraordinary circumstance it has put the Tribe in.

---

[98] *Saginaw v. Board I* Injunctive Proceedings, 838 at 600.

44

152.   By requiring the Tribe to participate in administrative proceedings before a predetermined tribunal whose decision may not be reviewed by an Article III court, the Board has denied the Tribe due process of law and violated Section 706(2)(B) of the Administrative Procedures Act.[99]

153.   Moreover, by requiring the Tribe to participate in administrative proceedings that irreparably injury it when it has the discretion to relieve the Tribe of the injury it causes but refuses to do so, the Board has denied the Tribe due process of law and violated Section 706(2)(B) of the Administrative Procedures Act.[100]

154.   The Tribe will be irreparably harmed if the election hearing proceeds before the Sixth Circuit decision.

155.   There is no adequate remedy at law for this violation of the Tribe's due-process rights.

### Count IV – Violation of the National Labor Relations Act

156.   The Tribe realleges and incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

---

[99] 5 U.S.C. § 706(2)(B).
[100] 5 U.S.C. § 706(2)(B).

157.   Under Section 9(c) of the NLRA, when a petition for a representation election is filed, the Board must investigate that petition and "shall provide for an appropriate hearing upon due notice" before the election is held.[101]

158.   The same section of the NLRA provides that "[s]uch hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto."[102]

159.   The 2015 Rule violates Section 9(c)(1)'s direction that the Board "provide for an appropriate hearing" by curtailing the Tribe's ability to present evidence and litigate issues of jurisdiction and voter eligibility or inclusion in the putative bargaining unit.

160.   The 2015 Rule also violates Section 9(c)(1)'s mandate that the Board's hearing officers "shall not make any recommendations with respect" to the hearings they conduct because the Rule vests regional-office personnel with decision-making authority concerning what issued will be litigated at the pre-election and what evidence will be admitted into the record.

161.   The 2015 Rule further violates Section 9(c)(1)'s structure and purpose by requiring parties to litigate critical voter-eligibility issues and questions of inclusion in the putative bargaining unit *after* an the Board holds an election.

---

[101] 29 U.S.C. § 159(c)(1).
[102] *Id.*

162.   The Board's actions are contrary to the National Labor Relations Act, in excess of the Board's statutory jurisdiction and authority, and violate Section 706(2)(C) of the Administrative Procedures Act.[103]

163.   The Tribe will be irreparably harmed if the election hearing proceeds.

164.   There is no adequate remedy at law for this violation of the Tribe's statutory rights.

**Count V – Violation of the First Amendment and the NLRA**

165.   The Tribe realleges and incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

166.   Under Section 8(c) of the NLRA, Congress expressly protected employers' freedom to speak: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisals or force or promise of benefit."[104]

167.   The U.S. Supreme Court has recognized that Section 8(c) "merely implements the First Amendment" to the United States Constitution, confirming that "an employer's free speech right to communicate his views to his employees is

---

[103] 5 U.S.C. § 706(2)(C).
[104] 29 U.S.C. § 158(c).

firmly established and cannot be infringed by a union  or the National Labor Relations Board."[105]

168.   Section 8(c) reflects a "policy judgment, which  suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide open debate in labor disputes."[106]

169.   Section 8(c)'s encouragement of the free exchange of ideas "serves a labor law function of allowing employers to present  an alternative view and information that a union would not present."[107]

170.   The text of the NLRA and relevant case law thus establish that, through Section 8(c), Congress determined that the Board must afford employers the opportunity to effectively communicate with their employees on the subjects of union organizing and collective bargaining.

171.   By substantially limiting the time between an election petition and the election, the 2015 Rule unlawfully curtails the Tribe's right to communicate with its employees, contrary to Section 8(c) of the Act and the first amendment to the

---

[105] *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).
[106] *Chamber of Commerce v. Brown,* 554 U.S. 60, 67–68 (2008) (internal quotation omitted).
[107] *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947,  955 (D.C. Cir. 2013) (citation omitted).

U.S. Constitution, and violate Sections 706(2)(B) and (C) of the Administrative

Procedures Act.[108]

172.   The Tribe will be irreparably harmed if the election hearing proceeds.

173.   There is no adequate remedy at law for this violation of the Tribe's

statutory and constitutional rights.

### Count VI – Violation of the First Amendment (Compelled Speech)

174.   The Tribe realleges and incorporates by reference paragraphs 1 through

116 as if fully set forth herein.

175.   The 2015 Rule requires employers to post a workplace notice (and in

certain circumstances, to send the notice to its employees electronically) when a

representation petition is filed, and to maintain the notice posting until the election

is held.

176.   If the Tribe were to post the notice, it would violate its own No-

Solicitation policy.

177.   The 2015 Rule also requires employers to share sensitive confidential

information (including employees' home addresses, personal email address, and

home and cell-phone numbers) with the organizing union when a representation

petition is filed.

---

[108] 5  U.S.C. § 706(2)(B)–(C).

178.   If the Tribe were to provide this sensitive confidential information to the USW Union, it would violate its own confidentiality judgments.

179.   By requiring the Tribe to post and maintain the Board's notice and to share confidential information with a third party, the 2015 Rule compels the Tribe to engage in certain speech that is contrary to its laws and policies.

180.   By compelling the Tribe to speak, the 2015 Rule unlawfully infringes on the Tribe's freedom of speech under the First Amendment to the U.S. Constitution, and violates Section 706(2)(B) of the Administrative Procedures Act.[109]

181.   The Tribe will be irreparably harmed if the election hearing proceeds.

182.   There is no adequate remedy at law for this violation of the Tribe's constitutional rights.

### Count VII – The Board's Actions Are Arbitrary and Capricious

183.   The Tribe realleges and incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

184.   Under the Administrative Procedures Act, courts must hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or

---

[109] *Id.* § 706(2)(C).

otherwise not in accordance with law,[110] or that is not taken in accordance with procedure required by law.[111]

185.   The 2015 Rule arbitrarily and capriciously seeks to speed the representation election process even though, in 90 percent of its election cases, the Board already conducts the elections faster than its time targets, has met its time targets for many years, and the has not set any new time targets for which the new procedures would be necessary.

186.   The 2015 Rule arbitrarily and capriciously changed the election proceedings for all representation cases even though the alleged "problems" the Board relies on to justify its 2015 Rule exist in only a small fraction of cases.

187.   The 2015 Rule prioritizes speed in holding elections at the expense of free speech, due process, and the NLRA's other statutory goals and requirements.

188.   The 2015 Rule arbitrarily and capriciously volunteers workers' personal phone numbers and email addresses to labor unions with whom they may have had no previous relationship and without the workers' consent.

189.   The Board arbitrarily and capriciously purports to seek to reduce litigation through the 2015 Rule, but the available evidence demonstrates that the 2015 Rule will increase overall litigation, including litigation in federal courts.

---

[110] 5 U.S.C. § 706(2)(A).
[111] *Id.* § 706(2)(D).

190. The Board failed to meaningfully consider myriad legal, policy, and economic arguments against the 2015 Rule or to articulate a rational basis for rejecting them.

191. The Board's adoption of the 2015 Rule was arbitrary and capricious, and it enacted the 2015 Rule without observing the procedure required by law.[112]

**WHEREFORE,** the Tribe respectfully asks this Court to enter judgment in its favor and to:

I.     Issue a declaratory judgment against the Board declaring that the Board may not apply the Act to the Tribe, the Tribe's operations at its gaming facilities including Soaring Eagle, or any of the Tribe's officials, agents, or representatives.

II.     Enjoin the Board from taking any action to apply the Act to the Tribe, the Tribe's operation of the Casino, or any of the Tribe's officials, agents or representatives acting in their official capacities.

III.     Vacate, hold unlawful, and set aside the 2015 Rule.

IV.     Award the Tribe its costs, and such other relief as this Court may deem just or equitable.

---

[112] *Id.* §§ 706(2)(A)–(D).

Dated: June 8, 2015

SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN

s/ William A. Szotkowski

| | |
|---|---|
| William A. Szotkowski (MN # 161937) | Sean Reed (MI # P62026) |
| Jessica Intermill (MN # 0346287) | General Counsel |
| Jessie Stomski Seim (MN # 0388973) | Saginaw Chippewa Indian Tribe |
| _admission pending_ | 7070 East Broadway |
| Hogen Adams PLLC | Mt. Pleasant, Michigan 48858 |
| 1935 W. County Rd B2, Suite 460 | Tele: (989) 775-4032 |
| St. Paul, MN 55113 | Fax: (989) 773-4614 |
| Phone: 651-842-9100 | E-mail: sreed@sagchip.org |
| Facsimile: 651-842-9101 | |
| E-Mail: bszotkowksi@hogenadams.com | |
| jintermill@hogenadams.com | |
| jseim@hogenadams.com | |

53