# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

---

THE SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN, a federally
recognized Indian tribe,

                    Plaintiff,

v.

MARK G. PEARCE, CHAIRMAN, KENT
Y. HIROZAWA, PHILIP A. MISCIMARRA,
HARRY I. JOHNSON, III, and LAUREN
MCFERRAN in their official capacities as
members of the National Labor Relations
Board, and TERRY A. MORGAN in her
official capacity as Regional Director of
Region 7.

                    Defendants.

Court File No.
1:15-cv-12077

Hon. Marianne O. Battani

---

## Saginaw Chippewa Indian Tribe of Michigan's
## Emergency Motion for Preliminary Injunction

---

The Saginaw Chippewa Indian Tribe of Michigan moves the Court to issue an order under Rule 65 of the Federal Rules of Civil Procedure temporarily restraining the National Labor Relations Board, its Members, and its Regional Director from proceeding in NLRB Case No. 07-RC-152046 (the "2015 Election Case"), and staying this case until 60 days after the United States Court of Appeals for the Sixth Circuit issues an opinion in the pending cross appeals, Cases No. 14-

2405 and 14-2558 (the "Sixth Circuit Case"). More specifically, the Board has set

a June 15, 2015 hearing in the 2015 Election Case, and the Tribe moves this court

to order the Board to adjourn that hearing and stay this case until 60 days after the

Sixth Circuit issues its ruling in the Sixth Circuit Case.

The Sixth Circuit Case considers the same question presented by Count I of

the Tribe's Complaint, so a decision in the Sixth Circuit is very likely to control

this Court's decision of Count I. The Tribe is very likely to succeed on the merits

of Count I of its Complaint, a threshold question that could moot Tribe's entire

Complaint. Moreover, granting this motion would avoid irreparable injury to the

Tribe, will not cause harm to others, and serves the expressed federal policy of

supporting tribal self-governance and the federal trust responsibility to Indian

tribes. It also serves judicial efficiency by maintaining the *status quo* while the

Sixth Circuit decides a threshold question that may control this case. The Tribe has

contacted counsel for all parties to seek concurrence with this motion and to

resolve this dispute without court action.  The defendants oppose the motion, and

court action is necessary to resolve the dispute.  The Tribe files a supporting

memorandum and exhibits with this motion, but respectfully requests that this

matter be decided without hearing or, if a hearing is required, by telephonic

hearing.

WHEREFORE, the Saginaw Chippewa Indian Tribe of Michigan

respectfully requests that this Court grant its motion for a temporary restraining

order.

Dated: June 8, 2015

s/  Jessica Intermill
William A. Szotkowski (MN # 161937)        Sean Reed (MI # P62026)
Jessica Intermill (MN # 0346287)           General Counsel
Jessie Stomski Seim (MN # 0388973)         Saginaw Chippewa Indian Tribe
      *admission pending*                  7070 East Broadway
Hogen Adams PLLC                           Mt. Pleasant, Michigan 48858
1935 W. County Rd B2, Suite 460            Tele: (989) 775-4032
St. Paul, MN 55113                         Fax: (989) 773-4614
Phone: 651-842-9100                        E-mail: sreed@sagchip.org
Facsimile: 651-842-9101
E-Mail: bszotkowksi@hogenadams.com
        jintermill@hogenadams.com
        jseim@hogenadams.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

THE SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN, a federally
recognized Indian tribe,

                             Plaintiff,

v.

MARK G. PEARCE, CHAIRMAN, KENT
Y. HIROZAWA, PHILIP A. MISCIMARRA,
HARRY I. JOHNSON, III, and LAUREN
MCFERRAN in their official capacities as
members of the National Labor Relations
Board, and TERRY A. MORGAN in her
official capacity as Regional Director of
Region 7.

                            Defendants.

Court File No.
1:15-cv-12077

Hon. Marianne O. Battani

## Saginaw Chippewa Indian Tribe of Michigan's Memorandum in Support of Emergency Motion for Preliminary Injunction

## Concise Statement of Issue Presented

A pending Sixth Circuit Appeal will decide whether the National Labor Relations Board may exercise jurisdiction over the Tribe. Less than a week after that court heard oral argument and took the case under advisement, the Board commenced a new action against the Tribe that raises the same jurisdictional question. Enjoining the Board from proceeding in the new action until the Sixth Circuit decides the jurisdictional question would preserve the status quo and prevent irreparable injury to the Tribe. Should this Court preliminarily enjoin the Board?

## Controlling or Most Appropriate Authority

*Kentucky v. U.S. ex rel. Hagel*, 769 F.3d 588 (6th Cir. 2014) (exceptions to administrative exhaustion).

*Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171 (6th Cir. 1995) (injunctive relief factors).

## Related Cases

*Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board*, Case No. 14-2405, 14-2558 (6th Cir. pending).

*Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board*, 838 F. Supp. 2d 598 (E.D. Mich. 2011).

*Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, No. 05-10296-BC, 2010 WL 5185114 (E.D. Mich. 2010).

## **Background**

The National Labor Relations Board, its members, and its Regional Director (collectively, "the Board") have unlawfully asserted jurisdiction over the Saginaw Chippewa Indian Tribe of Michigan, doing business as its wholly owned Soaring Eagle Casino & Resort (the "Casino") six times in the last eight years. Each time, the Tribe has relied on controlling Supreme Court and Sixth Circuit law to demonstrate that the Board cannot apply the Act to the Tribe. Each time, the Board has relied on its own test (which adopts a Ninth Circuit case that conflicts with Supreme Court precedent[1]) to abrogate the Tribe's inherent and treaty-protected sovereign rights. And each time, the Board has irreparably injured the Tribe.

### I.      **Early Board proceedings against the Tribe**

The first three times that the Board unlawfully asserted jurisdiction, vagaries of the National Labor Relations Act ("NLRA" or "Act") left the Tribe with no avenue for judicial review of the irreparable injury the Board's unlawful assertion of jurisdiction inflicted on the Tribe. The first two were representation election cases that arose under Section 9 of the Act.[2] In both, the Board relied on its own test to decide it had jurisdiction over the Tribe, and required the Tribe to undergo an election. And in both cases, the workers voted against unionizing.

---

[1] *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (1985).
[2] 29 U.S.C. § 159 (titled "Representatives and Elections").

1

Unlike Section 10, which concerns unfair-labor-practice charges and includes a statutory method for direct review of Board decisions,[3] Section 9 representation election cases do not afford direct judicial review. As the Sixth Circuit has explained, ""[a]n employer cannot get direct judicial review of the Board's bargaining unit determination [under Section 9]—instead, it must refuse to bargain with the union [under Section 10] and then raise the issue of the unit's appropriateness in a subsequent unfair-labor-practice proceeding."[4] In both of the first two proceedings against the Tribe, though, the workers' voting not to unionize meant that the Tribe could not draw the unfair-labor-practice charge that would allow indirect review of the Board's Section 9 election decision. That is, in the first two proceedings against the Tribe, because the Tribe won the elections, it could not appeal the Board's unlawful exercise of jurisdiction.

In the third proceeding, the parties settled the action and the Board's unlawful exercise of jurisdiction again avoided judicial review.

## II.    The Sixth Circuit Case

The fourth time that the Board unlawfully asserted jurisdiction over the Tribe was a Section 10 unfair-labor-practice case. The Tribe asked this Court to

---

[3] *Id.* at § 160 (titled "Prevention of Unfair Labor Practices").
[4] *Kindred Nursing Centers East, LLC v. NLRB*, 727 F.3d 552, 558 (6th Cir. 2013).

2

enjoin the proceeding and answer the question of the Board's jurisdiction itself, but the Court instructed the Tribe to exhaust its administrative remedies.[5]

At the hearing, the presiding Administrative Law Judge Rosas acknowledged that he had no experience in federal Indian law or treaty interpretation, stating "what I'm hearing thus far is very new to me based on I think most of our legal education regarding basic contract law between parties to the extent that agreements are generally construed from an objective standpoint."[6] When the Tribe introduced evidence of its sovereign- and treaty-protected rights that bar the Board's assertion of jurisdiction, the Board's attorney repeatedly raised unfounded objections to the evidence,[7] and the Judge, at times, sustained the objections.[8] In the end, the Judge recognized that the Ndoes not expressly include tribes.[9] He also accepted the Tribe's unrebutted evidence of its enduring treaty rights.[10] But he nevertheless determined that the Tribe's "general" sovereign rights cannot block the Board's exercise of jurisdiction under the National Labor

---

[5] *Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board et al.* ("*Saginaw Injunction Case*"), 838 F. Supp. 2d 598 (E.D. Mich. 2011).
[6] Compl., Ex. H (Transcript) at 20:24–21:3. *See also id.* at 17:21–23, 23:9–14.
[7] *Id.* at 32:16–22, 22:5–6.
[8] *Id.* at 29:6–29; 75:14–20.
[9] *See* Compl., Ex. G (Decision and Order, *Soaring Eagle Casino & Resort and Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America,* ("*2013 Board Decision*"), 359 NLRB No. 92, 2013 WL 1646049 (NLRB April 16, 2013), at *13.
[10] *Id.* at *4.

Relations Act.[11] The Tribe filed exceptions to the opinion, but the Board adopted

the Judge's decision as its own with little additional analysis.[12]

Section 10 of the NLRA allows appeal from a Board unfair labor practice

decision.[13] The Tribe spent four years in front of the Board before the Sixth Circuit

took up the question of the Board's jurisdiction. In appellate briefing,[14] the Tribe

demonstrated that the Board's fish-out-of-water analysis is contrary to the well-

established reserved-rights doctrine[15] and enduring principles of federal Indian

---

[11] *Id.* at *7–8 (concluding "[n]either treaty, however, even remotely addresses the future application of Federal regulatory laws to the predecessor Tribe's business operations involving non-Indian employees.").

[12] *Id.* at *1. The original decision was appealed by the Tribe but vacated in light of *NLRB* v. *Noel Canning*, 134 U.S. 2550, ___ U.S. ___ (2014). The Sixth Circuit remanded for reconsideration by a properly constituted Board, and that Board affirmed the original decision, adopting it and incorporating it by reference.  *Soaring Eagle Casino & Resort and Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, 361 NLRB No. 73, 2014 WL 5426873 (NLRB Oct. 27, 2014), at *1. The Tribe appealed the new decision and the Board filed a cross-appeal for enforcement. *Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board et al.*, Case No. 14-2405, 14-2558 (6th Cir. pending).

[13] 29 U.S.C. § 160(f).

[14] *See* Briefs for Petitioner and Respondent and Petitioner's Reply, *Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board*, Case No. 14-2405, 14-2558 (Jan. 15, 2015), attached as Exs. A, B, and C, respectively.

[15] *E.g. United States v. Winans*, 198 U.S. 371, 381 (1905) (explaining that an Indian treaty is "not a grant of rights *to* the Indians, but a grant of rights *from* them—a reservation of those [rights] not granted." (emphasis added); *Winters v. United States*, 207 U.S. 564 (1908) (finding riparian rights in a treaty that didn't mention water); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144-47 (1982) (finding right to impose a severance tax on oil and gas in a treaty that didn't mention oil, gas, or taxation); *United States v. Michigan*, 471 F. Supp. 192, 257, 273 (W.D. Mich. 1979) *aff'd by* 653 F.2d 277 (6th Cir. 1981) (holding Sault Ste.

law.[16] In dialog with the Board's attorney at oral argument, each member of the

panel expressed skepticism with the Board's request that the court follow

*Tuscarora* dictum and the Ninth Circuit's *Couer d'Alene* analysis instead of

Supreme Court precedent:

- Judge O'Malley: "[In Supreme Court cases,] *Couer d'Alene* is never cited, *Tuscarora* is never cited. And now we're here and you're arguing for all these things that the Supreme Court itself never has said are meaningful or important[.]"[17]

- Judge O'Malley: "That's not what [Supreme Court cases] say, is it? They don't say you can, you can abrogate sovereignty as long as it's a certain kind of sovereignty. They said if you fall within this definition of what constitutes

---

Marie Tribe's aboriginal rights to fish in off-reservation waters preserved *even though* the rights were not expressly listed in the Treaties); *accord Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1284 (10th Cir. 2010) (holding that silent employment laws of general application do not apply to tribes).

[16] *E.g.*, *United States v. Dion*, 476 U.S. 734, 740 (1986) (explaining that a court *may* find that Congress abrogated tribal sovereign rights by statute, but *only if* there is evidence that "Congress *actually* considered the conflict between" the statute and the Tribe's sovereign rights "*and* chose to resolve that conflict by abrogating the treaty[.]" (emphasis added). *Accord Michigan v. Bay Mills Indian Cmty.*, 134 S.Ct. 2024, 2031 (2014) ("Our decisions establish as well that such a congressional decision must be clear. The baseline position, we have often held, is tribal immunity; and "[t]o abrogate [such] immunity, Congress must 'unequivocally' express that purpose." That rule of construction reflects an enduring principle of Indian law: Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government.") (internal citation omitted).

[17] Tr. at 15:13–16, *Saginaw Chippewa Indian Tribe of Michigan v. National Labor Relations Board*, Case No. 14-2405, 14-2558 (6th Cir. April 29, 2015) ("Tr."), Ex. D. Although the transcript does not include the names of the judges, counsel for the Tribe has identified them. Szotkowski Decl., Ex. E.

5

their traditional ground of sovereignty, then you have to have the express and clear statement before it can be abrogated."[18]

- Judge O'Malley: "You are relying on this distinction, in your mind, between governmental and commercial . . . . But the Supreme Court never really recognized that distinction.[19]

- Judge O'Malley: "We're not bound by [*Coeur d'Alene*], we're bound by the Supreme Court."[20]

- Judge O'Malley: "[S]overeignty is a broader concept than you're allowing[.]"[21]

- Judge White: "When you're talking about whether this [the NLRA] applies, doesn't it matter that the federal agency in charge of these relationships [with tribes] says it doesn't apply?"[22]

- Judge White: "Don't we turn the law on its head by presuming [the NLRA] applies?"[23]

- Judge Donald: "[I]f we adopt your position, we adopt your argument and agree with that, doesn't that really eviscerate the tribe's right to the very benefits of the treaty that it was intended to provide, because it would eviscerate their right really to self government[?]"[24]

- Judge White: "You seem to be arguing policy about what Congress should be able to do, as opposed to addressing the question of what Congress did. I mean you're making this assertion that Congress intended this to apply to Indians, but where is the support? And hasn't there been a standard established that says that it has to be clear, that we are not going to presume

---

[18] Tr. at 17:14–21.
[19] *Id.* at 23:21–24:3
[20] *Id.* at 29:22–23.
[21] *Id.* at 24:15–16.
[22] *Id.* at 33:13–16.
[23] *Id.* at 28:22–23.
[24] *Id.* at 30:18–23.

that Congress intended to do this, but we want to see that they intended to do it[?]"[25]

- Judge O'Malley: "That's the policy argument you should be making to Congress, and you should say to Congress you should expressly include Indian tribes, you should specifically abrogate their sovereignty to the extent necessary to apply this statute. Why are we doing this? This is all policy arguments you're making, and the policy arguments fly in the face of the policy arguments that for years ha[ve] underlay[ed] all of this Indian law."[26]

The Sixth Circuit took that case under advisement on April 29, 2015.

## III.   Board proceedings against the Tribe during the Sixth Circuit Case

In May 2015, the Board made its fifth unlawful assertion of jurisdiction over the Tribe while the Tribe was still exhausting its administrative remedies in the fourth case. It was another Section 9 representation election case, and the Tribe once again tried to demonstrate that jurisdiction did not lie, even under the Board's test. Under its test, the Board "recognize[d] the necessity of going beyond the general test of *Tuscarora-Coeur d'Alene* to examine the specific facts in each case to determine whether the assertion of jurisdiction over Indian tribes will effectuate the purposes of the Act."[27] It reasoned that when tribes "are fulfilling traditionally tribal or governmental functions[,]" then "the Board's interest in effectuating the policies of the Act is likely to be lower" in these circumstances.[28] It further

---

[25] *Id.* at 18:13–22.
[26] *Id.* at 31:24–32:7.
[27] *San Manuel Indian Bingo & Casino & Hotel Emps. & Rest. Emps. Int'l Union*, 341 N.L.R.B. 1055, 1062 (2004).
[28] *Id.* at 1063.

recognized that its determining these circumstances would require "careful balancing" on "a case-by-case basis[.]"[29]

The Tribe offered expert testimony concerning its seventeenth-century, eighteenth-century, and nineteenth-century participation in the trans-continental fur trade (including its regulation of its non-tribal commercial partners). That evidence demonstrated that the Tribe participated in and regulated commerce with non-members to generate resources to care for its population *even before the Revolutionary War*. That is, engaging in commerce with nonmembers around the world *is* a "traditionally tribal or governmental function" that the Board lacks jurisdiction over.

The Regional Director accepted this evidence[30] but nevertheless decided that the Board has jurisdiction over the Tribe because "the Board has consistently applied *San Manuel* to the [Tribe], and asserted jurisdiction."[31] That is, although the Regional Director acknowledged the "case-by-case" nature of the Board's test,[32] she rejected the Tribe's newly proffered evidence because the Board had already ruled against the Tribe. The Tribe asked the Board to review the Regional

---

[29] *Id.*

[30] Compl., Ex. L, *Soaring Eagle Casino & Resort v. International Union, Security, Police, & Fire Professionals of America* ("*2014 Board Decision*"), 07-RC-129013 (Sep. 26, 2014) at 3–4 (NLRB).

[31] *Id.* at 5.

[32] *Id.* at 4.

Director's decision, but it refused to do so.[33] Thus, the Board once again required the Tribe to participate in another election. Once again, the workers voted against unionization. And once again, the Act left the Tribe without any mechanism for judicial review.

## IV.   Board proceedings against the Tribe after the Sixth Circuit Case

Finally, the underlying Section 9 representation election dispute (the "2015 Election Case") is the Board's sixth unlawful assertion of jurisdiction over the Tribe. The case began *less than two weeks* after the Sixth Circuit took the question of the Board's jurisdiction under advisement. It was also subject to new Board rules that, among other things, truncate the time between the filing of an election petition and the holding of an election.[34] The Tribe asked the Board to exercise its discretion—discretion expressly allowed under its new rules[35]—to stay the proceeding until after the Sixth Circuit decides the jurisdictional question.[36] The Board refused. Instead, it pressed forward, ignoring its own rules and leaving the Tribe no other option than to file the instant Complaint.

---

[33] *Soaring Eagle Casino & Resort v. International Union, Security, Police, & Fire Professionals of America*, 07-RC-129013 (Oct. 27, 2014), Ex. F.
[34] *See* 29 CFR §§ 101.17–103.20
[35] 29 CFR 102.63(b)(1) (allowing indefinite postponement of Board proceedings "upon request of a party showing extraordinary circumstances").
[36] Compl., Ex. N, Letter from S. Reed to E. Ray (May 17, 2015).

9

If the underlying case proceeds to hearing, the Tribe will again try to meet the Board's "case by case" test, even though the Board has already demonstrated that its assertion of jurisdiction is a foregone conclusion and that the hoops it demands that the Tribe jump through are futile. And if the workers once again vote against unionization, then the Act will again leave the Tribe without any way to bring this sixth unlawful assertion of agency jurisdiction to a court's attention.

## V.     The instant motion

Indian law aside, the Tribe's instant Complaint raises a variety of statutory and constitutional challenges to the Board's sixth proceeding against the Tribe. Prevailing on any of these counts, would invalidate the Board's unlawful exercise of jurisdiction. But the Tribe recognizes that the pending Sixth Circuit case is very likely to decide Count I of the Tribe's Complaint in this case. And if the Sixth Circuit follows controlling Supreme Court and its own precedent to find for the Tribe, then it will moot all of the other counts in the Tribe's Complaint. Accordingly, to foster judicial efficiency and prevent further irreparable injury to the Tribe, the Tribe seeks a very limited preliminary injunction restraining the Board from exercising jurisdiction until the Sixth Circuit answers the threshold Indian law question of whether the Board has jurisdiction over the Tribe.

## ARGUMENT

### I.    Each factor supporting the issuance of a preliminary injunction favors the Tribe.

The Court must consider four factors to decide whether to issue a preliminary injunction: 1) the likelihood of the Tribe's success on the merits; 2) whether the preliminary injunction would save the Tribe from irreparable injury; 3) whether issuance of the preliminary injunction would harm others; and 4) whether the t preliminary injunction would serve the public interest.[37] The likelihood of success that a plaintiff must show "will vary inversely with the degree of injury the plaintiff will suffer absent an injunction."[38] That is, the test requires "a realistic appraisal of all the traditional factors weighed by a court of equity. A balancing is required, and not the mechanical application of a certain form of words."[39]

### A.    The Tribe is likely to succeed on the merits of its claims.

The Tribe's sovereign powers predate the creation of the United States. As this Court is aware, in the 1800s, the United States entered into two treaties with the Tribe,[40] interacting with the Tribe on a nation-to-nation basis. The 1864 treaty

---

[37] *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1175 (6th Cir. 1995).
[38] *Roth v. Bank of the Commonwea*lth, 583 F.2d 527, 538 (6th Cir. 1978).
[39] *Id*.
[40] Compl., Ex. B (Treaty with the Chippewa of Saginaw, Swan Creek, and Black River, August 2, 1855, 11 Stat. 683 (Aug. 2, 1855) ("1855 Treaty")); Compl., Ex. C (Treaty with the Chippewa of Saginaw and Swan Creek and Black River, 1864, 14 Stat. 637 (Oct. 18, 1864) ("1864 Treaty")).

preserved the Tribe's "exclusive use, ownership, and occupancy" of its Isabella Reservation.[41] In doing so, the Treaty protects the Tribe's power to exclude unwanted persons from the Reservation and its power to place conditions on people's entry onto the Reservation.[42] The Tribe's inherent sovereignty also includes the right to manage and use its territory and resources as it wishes, regulate the economic activity within the reservation, make its own laws and be ruled by them, and to govern its members and territory.[43]

The Board's application of the Act necessarily abrogates these rights. For example, ordering the Tribe to cease and desist from following tribal law violates the Tribe's right to govern itself, manage its territory, and regulate economic activity within its reservation. Similarly, holding elections that would require the Tribe to allow an elected union into its reservation violates the Tribe's right to exclude, including its "ultimate power to oust the non-Indian" from the reservation.[44]

---

[41] Compl., Ex. C (1864 Treaty) at Art. 2.

[42] *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) (holding the right to exclude "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct[.]").

[43] *E.g.*, *id.* at 137 ("The power to tax is an essential attribute of Indian sovereignty . . . . [I]t derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction . . . ."); *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1192–93 ("In addition to broad authority over intramural matters such as membership, tribes retain sovereign authority to regulate economic activity within their own territory[.]").

[44] *Merrion*, 455 U.S. at 144.

Under controlling law, the Board may only do this if "Congress *actually* considered the conflict between" the NLRA and the Tribe's sovereign rights "*and* chose to resolve that conflict by abrogating the treaty[.]"[45] But the NLRA makes no mention of tribes or tribal rights, and the Board has never even argued that Congress considered this conflict and opted to abrogate tribal rights. This is the disconnect that led the Sixth Circuit to grill the Board, questioning why that court should follow a Ninth Circuit decision that "turn[s] the law on its head"[46] and "fl[ies] in the face"[47] of federal Indian law instead of following controlling law.

No Supreme Court or Sixth Circuit decision supports the Board's position, and each of the three panel members questioned the Board's reliance on the Ninth Circuit *Coeur d'Alene* decision.[48] Because the Board's argument "fl[ies] in the face" [49] of controlling Indian law decisions of both the Sixth Circuit and the Supreme Court, the Tribe is likely to succeed on the merits of its Complaint.

**B.    The Tribe will suffer irreparable injury without a preliminary injunction.**

The Tribe will suffer irreparable harm if this Court does not preliminarily enjoin the Board from proceeding in the 2015 Election Case until after the Sixth

---

[45] *Dion*, 476 U.S. at 740.
[46] Tr. at 28:22–23 (Judge White).
[47] *Id.* at 31:24–32:7 (Judge O'Malley).
[48] *See* Background § II, *supra*.
[49] Tr. at 31:24–32:7.

Circuit rules on the Board's jurisdiction. If that case proceeds, the Tribe will have to litigate a complex jurisdictional issue for the *sixth* time before a tribunal that lacks expertise in the area. It must again present new evidence to try to meet the Board's "case-by-case" standard[50] even though the Board has demonstrated that it considers only its own earlier decisions and not the evidence before it.[51] It must make this record even though the peculiarities of the Board process may well leave the Tribe—as it left the Tribe in *each of three* earlier representation election cases against the Tribe—without an avenue to appeal the Board's unlawful exercise of jurisdiction. And it must do all this even though the Sixth Circuit is on the cusp of a decision that may determine that the Board has no jurisdiction and no authority over tribes in Indian country *at all*.

   If the current election case goes forward, the damage will be done. The Tribe will suffer the irreparable injury of having been forced to litigate a single issue on two fronts—once before the Sixth Circuit, and once *again* before the Board—at the cost of judicial efficiency. It will have further suffered the irreparable injury of being forced to appear (again) before a tribunal that lacks jurisdiction over the Tribe. And it will again have been forced to divert valuable governmental resources toward litigation against the Board's unlawful exercise of jurisdiction

---

[50] *San Manuel Indian*, 341 NLRB. at 1063.
[51] *2014 Board Decision* at 5.

instead of toward governmental programs like police, fire, and education. But that injury is also irreparable because the Tribe can never recover these damages from the sovereign-immune Board.[52]

### C.    A preliminary injunction will not cause harm to others.

In requesting a preliminary injunction, the Tribe asks this Court to preserve the status quo, ceasing further irreparable injury to the Tribe. The Board will likely argue that any delay in an election will harm the proposed bargaining unit. But the Board cannot establish any harm in waiting what will likely be just a few months. No party has charged that there are emergency or otherwise unbearable working conditions at the Casino. Indeed, the outside guest personnel—the proposed bargaining unit—have never sought a representation election before in the Casino's over-17 year history, so it is difficult to see how a few months' wait will injure those workers.

The Board may also argue that a preliminary injunction would harm the union that seeks a representation election. The union may seek a quick election, but the law gives the Director discretion to delay it.[53] And indeed, as the Tribe's past experience demonstrates, the union may not even desire an election. In November

---

[52] Congress has only waived sovereign immunity for non-monetary cases brought against the NLRB. *See Stew Farm, Ltd. V. Natural Resources Conservation Serv.*, 767 F.3d 554, 559 (6th Cir. 2014).
[53] *See* 29 CFR § 102.63(b)(1).

2007, the International Union, Security, Police and Fire Professionals of America petitioned for an election, and in January 2008 the Board ordered one over the Tribe's jurisdictional objection.[54] But the Board cancelled the election at the union's request.[55] In follow-up news coverage, that union's leader made clear that the union's "strategy all along was not to go forward with an election[.]"[56] Instead, it used the Board's process to put the Tribe into "panic mode" and to secure a mailing list of the proposed bargaining unit as an organizing tool.[57]

Finally, the Board frequently heralds its congressional charge to implement federal labor law broadly. The Tribe expects it will argue that any delay in the election timeline (even though the Board's own rules recognize that delays are appropriate in certain circumstances) harms the Board's ability to effectuate this charge. But this assumes that the Board has jurisdiction to exercise—the very question before the Sixth Circuit. If the Board lacks jurisdiction over the Tribe (as all controlling law on the subject demands), then it cannot harm the Board to restrain it from irreparably injuring the Tribe.

The Tribe requests limited, tailored relief that would freeze the parties as

---

[54] Compl., Ex. G. (*Soaring Eagle Casino & Resort and Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, 359 NLRB No. 92, 2013 WL 1646049 (NLRB April 16, 2013)), at *7.
[55] *Id.* at *8.
[56] Compl., Ex. K (*Security Force May Still Have Union Vote*, The Morning Sun, Feb. 23, 2008).
[57] *Id.*

they are until this complex question of the Board's jurisdiction can "ultimately be resolved by the Sixth Circuit[.]"[58] Preserving the status quo for the few brief months it may take for the Sixth Circuit to decide this question cannot harm others.

### D.    A preliminary injunction would serve the public interest.

The Board's myopic commerce-or-not lens blocks its view of the entire federal-law landscape. But the Supreme Court,[59] executive branch,[60] and Congress[61] have each repeated their commitment to tribal self-governance—a right directly imperiled by the Board's unlawful exercise of jurisdiction. The Department of Interior, the agency with "primary responsibility for carrying out the Federal Government's trust obligations to Indian tribes[,]"[62] has explained that

---

[58] *Saginaw Injunction Case*, 838 F. Supp. 2d at 600.

[59] *E.g.*, *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) ("The Supreme Court has often emphasized the "longstanding policy of encouraging tribal self-government. This policy reflects the fact that Indian tribes retain attributes of sovereignty over both their members and their territory[.]").

[60] *E.g.* Exec. Order No. 13592, 3 C.F.R. 13592, Dec. 2, 2011, *available at* http://www.gpo.gov/fdsys/pkg/CFR-2012-title3-vol1/pdf/CFR-2012-title3-vol1-eo13592.pdf ("It is the policy of my Administration to support activities that will . . . fulfill our commitment to furthering tribal self-determination[.]").

[61] *E.g.*, Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450, *et seq.* (evincing the United States' commitment to "supporting and assisting Indian tribes in the development of strong and stable tribal governments"); Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.* (declaring that a principle goal of federal Indian policy is "to promote tribal economic development, tribal self-sufficiency, and strong tribal government"); Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.* (declaring the policy of Congress to help develop and utilize Indian resources "to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources").

[62] *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 (1987).

"Indian nations acting within their jurisdictions are exempt from the NLRA[.]"[63] That is, the agency charged with Indian-affairs authority and expertise concerning the question presented to the Sixth Circuit has long understood that the federal interest in this case lies in stopping the Board's unlawful exercise of jurisdiction over tribes. Blocking the Board from irreparably injuring the Tribe while the Sixth Circuit decides the question of the Board's jurisdiction serves the public interest by effectuating the United States' tripartite commitment to Tribal sovereignty.

Freezing the parties as they are while the Sixth Circuit decides the jurisdictional question would also serve the public interest by conserving judicial resources. The Tribe expects that the forthcoming Sixth Circuit decision will dispose of Count I of the Tribe's Complaint, and could well moot the remainder of its complaint. If the Sixth Circuit decides, as controlling law requires, that the Board lacks jurisdiction over the Tribe, then it must reject the pending election petition without a hearing, and the remaining Counts II through VIII will necessarily fall away. That is, the Sixth Circuit's forthcoming decision may well dispose of the Tribe's entire Complaint. Entering a brief preliminary injunction so that the parties and this Court can see what happens at the Sixth Circuit will thus advance the public interest in deploying judicial resources most efficiently.

---

[63] Letter from Patrice H. Kunesh to Lafe Soloman (Dec. 7, 2011), Ex. G; *see also* Letter from E.R. Blackwell to R. Meisenburg (Jan. 15, 2009), Ex. H.

The Tribe expects the Board to argue that the federal interest expressed in the Act are paramount to the federal interests in protecting tribal sovereignty and judicial resources. But here, too, any federal labor interest hinges on the yet-to-be-decided issue of whether the Board has jurisdiction over tribes. We know that federal Indian law policy favors a preliminary injunction in this case. But the Sixth Circuit will soon decide whether the Board has an interest in this case *at all*.

## II.      This Court has jurisdiction to grant the relief the Tribe requests.

In earlier litigation, this Court relied on the administrative-exhaustion doctrine to dismiss the Tribe's attempt to enjoin the Board from proceeding against the Tribe. But in this case, Congress has not compelled exhaustion. Moreover, none of the purposes of administrative-exhaustion would be served by exhaustion in this case, which falls within every exception to the exhaustion doctrine. Accordingly, this Court may exercise jurisdiction over this dispute.

### A. Congress has not required exhaustion in this case.

Congress has not "clearly required exhaustion"[64] in this case. In the earlier Saginaw Injunction Case, the underlying Board proceeding was a Section 10 unfair-labor-practice complaint, and the NLRA spelled out clear exhaustion requirements. "Section 10 of the Act vests jurisdiction in specific fora for

---

[64] *Kentucky v. U.S. ex rel. Hagel*, 769 F.3d 588, 599 (6th Cir. 2014).

evaluating whether an employer is engaging in an unfair trade practice[,]"[65] so Congress foreclosed district-court jurisdiction *over unfair labor practice claims*.[66]

But the dispute underlying this action is a representation-election proceeding that arose under Section 9 of the Act. Unlike Section 10, Section 9 lacks any clear exhaustion requirement. The Sixth Circuit has recognized this statutory mismatch, noting that "[a]n employer cannot get direct judicial review of the Board's bargaining unit determination [under Section 9]—instead, it must refuse to bargain with the union [under Section 10] and then raise the issue of the unit's appropriateness in a subsequent unfair-labor-practice proceeding."[67]

But that two-step exhaustion path has left the Tribe with *no* avenue of appellate review in *every one of the three different election cases that have occurred at the Casino*. Because Casino workers time and again vote against unionizing, the Tribe cannot draw the unfair-labor-practice charge that would kick it into a Section 10 case where it must exhaust additional administrative remedies but is assured Article III review of the Board's decisions. The Tribe thus cannot get

---

[65] *Saginaw Injunction Case*, 838 F. Supp. 2d at 602.
[66] *See also Myers v. Bethlehem Shipbuilding*, 303 U.S. 41, 48 (1938) ("[T]he power to prevent any person from engaging in any *unfair practice* affecting commerce has been vested by Congress in the Board and the Circuit Court of Appeals.") (emphasis added).
[67] *Kindred Nursing Centers East*, 727 F.3d at 558.

direct review *or indirect review* of the Board's unlawful assertion of jurisdiction (or any other error in the proceeding).

As the Sixth Circuit has recognized, "if the remedies provided for in the statutory scheme of review are inadequate in a particular case, an argument can be made that Congress did not intend to forbid the district courts from taking jurisdiction."[68] Congress's silence is Section 9 could not have "clearly required exhaustion" that may well (and for the Tribe each time has) end with an irreparable but unreviewable injury to the Tribe. Instead, "sound judicial discretion governs"[69] whether the Tribe must exhaust its administrative remedies in this case.

### B. This case fits every exception to the exhaustion rule.

Where Congress has not clearly required exhaustion, "exhaustion is an area of law in which 'sound judicial discretion governs[.]'"[70] This judge-made law is in place to give agencies the opportunity to correct their own mistakes,[71] and to allow agencies to create useful records.[72] Exhaustion is not required when it "does not serve the purposes behind the exhaustion doctrine."[73] In particular, "[e]xhaustion

---

[68] *Louisville & Nashville R.R. Co. v. Donovan*, 713 F.2d 1243, 1246 (6th Cir. 1983) (quotation omitted).
[69] *Kentucky*, 769 F.3d at 599 (citing *McCarthy*, 503 U.S. at 145).
[70] *Id.*
[71] *Shearson v. Holder*, 725 F.3d 588, 593 (6th Cir. 2013) (citing *McCarthy*, 503 U.S. 140, 145).
[72] *McCarthy*, 503 U.S. at 145.
[73] *Id.* (quoting *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1093 (6th Cir. 1981)).

may be excused if a litigant can show: (1) that requiring exhaustion will result in irreparable harm; (2) that the administrative remedy is wholly inadequate; or (3) that the administrative body is biased, making recourse to the agency futile."[74]

Here, requiring exhaustion would not serve the purposes of the rule. In its own words, "[t]he Board has no special expertise in construing Indian treaties."[75] It has already had *five chances* to correct its mistaken assertion of jurisdiction over the Tribe. It has refused each time. Although it has recently moved toward greater reliance on established canons of Indian law and greater respect for treaties, it still relies on the Ninth Circuit *Coeur d'Alene* test[76] that "turn[s] the law on its head"[77] and does not control the Sixth Circuit. Moreover, as three separate go-rounds have shown, requiring exhaustion in representation-election cases doesn't actually create a record that supports judicial review. Rather, the Tribe puts on its case and then wins the election, leaving the record to sit on a shelf where it can never be reviewed because injury or not, there is no appeal to be had.

This case need only fit one of the exceptions to excuse exhaustion, but it meets all three of the circumstances. Under the first exception to the exhaustion

---

[74] *Kentucky*, 769 F.3d at 599 (citing *McCarthy*, 503 U.S. at 146–48).
[75] *Chickasaw Nation d/b/a Winstar World Casino*, 362 NLRB No. 100, at *2 (June 4, 2015)
[76] *Id.*
[77] Tr. at 28:22–23 (Judge White).

doctrine,[78] requiring the Tribe to continue with the election case before the Sixth
Circuit rules will irreparably harm the Tribe, as section I(B) of the Tribe's
Argument, *supra*, describes.

The Tribe meets the second exception[79] because the administrative "remedy"
Section 9 creates is demonstrably inadequate. The Tribe had to wait *four years*
after the Board's first unlawful assertion of jurisdiction to draw the unfair-labor-
practice charge that would afford it judicial review—review that is now poised for
decision at the Sixth Circuit. The representation-election framework left the Tribe
with no avenue to review the Board's irreparable injury to the Tribe's sovereignty
*three times*, both before and after the unfair-labor-practice case that is now ripe for
Sixth Circuit decision. If history is any indicator, requiring exhaustion in this
election case will leave the Tribe with no remedy at all.

Finally, under the third exception, this Court may excuse exhaustion if the
administrative body is biased, making recourse to the agency futile.[80] The Board
has shown its bias. It has decided it has jurisdiction over the Tribe—the threshold
question posed by Count I of the Tribe's complaint—every one of the five earlier
times it has considered the question. Most recently, it acknowledged its own "case-
by-case" test, but nevertheless rejected the Tribe's new evidence outright because

---

[78] *Kentucky*, 769 F.3d at 599.
[79] *Id.*
[80] *Id.*

it had already ruled against the Tribe. Any additional proceedings before the Board are the definition of futility.

As this Court wrote, "the Sixth Circuit recognizes a narrow exception to the exhaustion requirement of § 160 [Section 10 unfair labor practices]" that "requires both a showing that the Board acted in excess of its delegated powers *and* that the aggrieved party would be 'wholly deprived' of its statutory rights."[81] Section 9 representation cases don't have an express exhaustion requirement, but even if they did, this case is the rare one that would fit this narrow exception. As the Tribe's Complaint alleges, the Board has acted well in excess of its powers, violating the NLRA, the Tribe's Treaties, and the U.S. Constitution. *And* the Tribe's three-time inability to appeal from representation cases demonstrates that it has fallen into a statutory gap that wholly deprives the Tribe of its rights, leaving the Board to irreparably injure the Tribe time and again with no recourse to the courts.

## CONCLUSION

The Tribe requests targeted, limited, temporary relief freezing the parties as they are for the brief period it will take for the Sixth Circuit to resolve the jurisdictional dispute between the Board and the Tribe. If the Tribe is wrong, the Board can resume the 2015 Election Case, and this Court can continue to the

---

[81] *Saginaw Injunction Case*, 838 F. Supp. 2d at 600 (citing *Detroit Newspaper Agency v. NLRB*, 286 F.3d 391, 397 (6th Cir. 2002)) (emphasis in original).

significant statutory and constitutional questions raised in the Complaint. But if the Tribe is right, this Court will prevent further irreparable injury to the Tribe's sovereignty and treaty-protected rights, and it will preserve its own limited resources. Because the Tribe easily meets all four elements necessary for the Court to issue this limited preliminary injunction, the Tribe respectfully requests that this Court take immediate action to preliminarily enjoin the Board, pausing the 2015 Election Case until after the Sixth Circuit decides the pending appeal.

Dated: June 8, 2015

SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN

s/Jessica Intermill
William A. Szotkowski (MN # 161937)       Sean Reed (MI # P62026)
Jessica Intermill (MN # 0346287)          General Counsel
Jessie Stomski Seim (MN # 0388973)        Saginaw Chippewa Indian Tribe
    *admission pending*                   7070 East Broadway
Hogen Adams PLLC                          Mt. Pleasant, Michigan 48858
1935 W. County Rd B2, Suite 460           Tele: (989) 775-4032
St. Paul, MN 55113                        Fax: (989) 773-4614
Phone: 651-842-9100                       E-mail: sreed@sagchip.org
Facsimile: 651-842-9101
E-Mail: bszotkowksi@hogenadams.com
        jintermill@hogenadams.com
        jseim@hogenadams.com

25

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

---

THE SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN, a federally
recognized Indian tribe,

      Plaintiff,

v.

MARK G. PEARCE, CHAIRMAN, KENT
Y. HIROZAWA, PHILIP A. MISCIMARRA,
HARRY I. JOHNSON, III, and LAUREN
MCFERRAN in their official capacities as
members of the National Labor Relations
Board, and TERRY A. MORGAN in her
official capacity as Regional Director of
Region 7.

      Defendants.

        Court File No. 1:15-cv-
        12077-MOB-RSW

---

**Certificate of Service By Overnight Mail**

---

STATE OF MINNESOTA  )
          )ss.
COUNTY OF RAMSEY  )

   I being duly sworn state that on June 8, 2015, Diana Kinney electronically

filed the following:

- Plaintiff's Motion and Memorandum in Support of Motion for Temporary
  Preliminary Injunction with Index and Exhibits A through H; and
- Proposed Order.

And also served the same in hard copy upon the following individuals by overnight mail:

Mark G. Pearce, Chairman
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
Ph:  202-273-1070
Fax:  n/a
Email:  n/a

Kent Y. Hirozawa, Member
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
Ph:  202-273-1740
Fax:  n/a
Email:  n/a

Philip A. Miscimarra, Member
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
Ph:  202-273-1790
Fax:  n/a
Email:  n/a

Harry I. Johnson, III, Member
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
Ph:  202-273-1770
Fax:  n/a
Email:  n/a

Lauren McFerran, Member
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
Ph:  202-273-1700
Fax:  n/a
Email:  n/a

Terry A. Morgan, Regional Director
NLRB Regional Office #7
477 Michigan Avenue, Room 300
Detroit, MI 48226-2569
Ph:  313-226-3200
Fax:  313-226-2090
Email:  terry.morgan@nlrb.gov

2

Barbara L. McQuade, U.S. Attorney,          Loretta E. Lynch, U.S. Attorney General
Eastern District of Michigan                Attorney General of the United States
United States Attorney's Office             U.S. Department of Justice
211 W. Fort Street, Suite 2001              950 Pennsylvania Avenue, NW
Detroit, MI 48226                           Washington, D.C. 20530-0001
Ph:  313-226-9100                           Ph:  202-514-2000
Fax:  313-226-2311                          Fax:  n/a
Email:  n/a                                 Email:  AskDOJ@usdoj.gov


Dated June 8, 2015

                                            s/William A. Szotkowski
                                            William A. Szotkowski (MN # 161937)
                                            Jessica Intermill (MN # 0346287)
                                            Hogen Adams PLLC
                                            1935 W. County Rd B2, Suite 460
                                            St. Paul, MN 55113
                                            Phone: 651-842-9100
                                            Facsimile: 651-842-9101